PER CURIAM.
The State of Florida seeks review of an order entered in the circuit court on Michael Peter Fitzpatrick’s postconviction motion filed under Florida Rule of Criminal Procedure 3.851. In its order, the circuit court vacated Fitzpatrick’s conviction of first-degree murder and sentence of death and granted Fitzpatrick a new trial. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm the circuit court’s order and grant Fitzpatrick a new trial.
FACTS AND PROCEDURAL HISTORY
A jury convicted Fitzpatrick of the first-degree murder and sexual battery of Laura Romines. Fitzpatrick v. State, 900 So.2d 495, 503 (Fla.2005). For the murder, the jury recommended a sentence of death by a vote of 10-2. Id. The trial court sentenced Fitzpatrick to death on the murder conviction and thirty years’ imprisonment on the sexual battery conviction to be served concurrently. Id. On direct appeal, we affirmed Fitzpatrick’s murder conviction and sentence. Id. Many of the facts and conclusions surrounding the murder and alleged sexual battery developed during trial have been called into serious question during these *742 postconviction proceedings. However, to fully address this motion we draw upon the facts as they were delineated by this Court on direct appeal:
[0]n August 18, 1996, at approximately 3 a.m., several individuals found Ro-mines walking on the side of the road, nude and bloody with her throat slit. When questioned at the scene, and then again at the hospital, Romines gave conflicting responses with regard to who attacked her. At the scene, she separately advised an individual who found her, a paramedic, and the first deputy to arrive that “Steve” had attacked her and that he lived at Water’s Edge Apartments. [n.l] Romines also told the paramedic that “Steve” was a 30-year-old male. The paramedic testified that Ro-mines was in and out of consciousness and possibly did not understand the question when she stated “Steve.” Ro-mines also stated that she was stabbed at the location where she was found and that she arrived there in a vehicle. Ro-mines was airlifted to the hospital. At the hospital, detectives Jeff Bousquet and Peter Weekes asked Romines if “Steve” had attacked her and she shook her head no.
[N.l.] “Steve” was later presumed to be Stephen Kirk, who became a suspect. At trial, the nature of Romines’ relationship with Kirk was revealed. Jeff Smedley, a corporal with the sheriffs office, testified that on August 17, 1996, he responded to a call from Water’s Edge Apartments. There, he was informed that Romines had been staying with Kirk and Barbara Simler, and was no longer welcome on the premises. Smedley discovered that Kirk met Romines at the motel where he worked as a security guard, and offered Romines a place to stay after she was beaten up by her boyfriend, Joe Galbert. The police eliminated Galbert as a suspect because he was in jail at the time of Romines’ stabbing.
A significant amount of investigative evidence exculpated Kirk of Romines’ sexual battery and murder. The DNA profile developed from Romines’ vaginal swabs was not consistent with Kirk’s DNA profile; numerous witnesses, including coworkers and guests at the motel where Kirk was working as a security guard, testified regarding his whereabouts that night; and Kirk’s vehicle was processed for possible blood evidence but no results were procured.
Rita Hall, an advanced registered nurse, who was accepted by the trial court as an expert in the field of the examination of sexual assault victims, conducted the SAVE (sexual assault victim examination) on Romines at the hospital. Hall testified that she found a bloody undergarment wrapped around Romines’ waist near her breasts, Ro-mines’ breasts were deep purple, there was a penetrating wound in the breast area that was either another stab wound or a bite mark, there was puffiness around her head, there was bruising on her arms, her legs were covered in scratches, and there was a cigarette burn on her leg.
Hall also examined and swabbed Ro-mines’ vaginal and anal areas. Hall concluded that sexual activity occurred within a fairly close proximity of time, a maximum of an hour or two, from when Romines was found. Hall also concluded that Romines never had the undergarment on after the sexual activity, due to the absence of semen on the undergarment. Hall detected several areas in the vagina and anus that were either a very deep pink or red, indicating there was pressure from something penetrat *743 ing the areas. In addition, Hall testified that her findings were consistent with forced sexual activity; however, she could not determine conclusively if the sexual activity was forced. Further, the evidence established that the DNA profile developed from Romines’ vaginal swabs was consistent with the DNA profile that was developed from Fitzpatrick’s blood sample. According to the medical examiner, the cause of death was hemorrhage and aspiration of blood due to incised wounds of the neck, penetrating the larynx and esophagus. The medical examiner could not indicate with any degree of precision the original length of the wound; however, the deepest penetration appeared to be one to one and a half inches.
With regard to Fitzpatrick’s involvement with Romines, the evidence established that on August 17, 1996, Romines was dropped off at a 7-Eleven between 7:30 and 8 p.m. Fitzpatrick, who was delivering pizzas for Pro Pizza, saw Ro-mines at the 7-Eleven. In his police statement, Fitzpatrick stated that when he stopped at the 7-Eleven to get gas and cigarettes he saw Romines crying and asked her if she needed a ride to the Sunny Palms Motel. Fitzpatrick stated that he then dropped off Romines at the motel, and later returned to the motel to check on her, but never saw her again. The 7-Eleven surveillance tape from that night revealed that Romines entered the store. The tape also revealed Fitzpatrick at the store.
Two State witnesses, Cindy Young and Jessica Kortepeter, testified that they witnessed a Pro Pizza delivery man arrive at the Sunny Palms Motel with Romines on the night of August 17 between 8:80 and 9 p.m. After Romines informed Kortepeter she was looking for a place to stay, Kortepeter recommended her friend Albert J. Howard. Kortepeter testified that Howard arrived at the Sunny Palms Motel, talked to Romines for about ten to fifteen minutes, and drove off with her at approximately 9 p.m. [n.2] Young and Kortep-eter’s testimony was consistent with Howard’s, who admitted that he went to the Sunny Palms Motel between 8:30 and 9 p.m. to talk to Romines, and talked to her for fifteen to twenty minutes before she decided to go with him to his house.
[N.2.] This testimony was corroborated by Fitzpatrick’s Pro Pizza employers, Deborah Bradford and Eugene Degele, who testified that Fitzpatrick informed them that he had gone that night to a convenience store, picked up a young lady, and taken her to the Sunny Palms Motel. Degele testified that he personally saw Fitzpatrick’s Pro Pizza truck in the motel parking lot. At trial, evidence was presented that after the stabbing Degele questioned Fitzpatrick regarding whether the girl who was stabbed was the same girl Fitzpatrick had picked up at the 7-Eleven, and Fitzpatrick denied it was she. However, the next day Fitzpatrick admitted to Degele that the girl he picked up was the one who was found stabbed later that night.
The evidence at trial established that Fitzpatrick clocked out with his time card at 11:45 p.m. on August 17, and took a pizza with him. Sally Goodwin, Kortepeter’s mother who was visiting Kortepeter at the Sunny Palms Motel, testified that she saw a Pro Pizza truck at the motel that night, but could not remember what time she observed the truck at the motel. Goodwin also testified that she left the motel and drove to Howard’s house, where she recalled see *744 ing the same Pro Pizza truck that left the motel. Howard confirmed that a pizza delivery man, whom he identified in court as Fitzpatrick, arrived at his house with a pizza, informed him the pizza was free, and asked him if Ro-mines was there. Howard testified that it was approximately midnight when Ro-mines left with the pizza delivery man “arm in arm.”
Howard’s testimony was consistent with that of Melanie Yarborough, who was at Howard’s house on August 17, 1996. At some point that night, Yarbor-ough observed a Pro Pizza delivery man arrive at Howard’s house. Yarborough recalled either helping place Romines’ bags in the pizza delivery man’s truck or handing the bags to Romines, who then placed the bags in the truck. Yarbor-ough testified that she saw Romines leave Howard’s house with the pizza delivery man.
At trial, evidence was presented that Fitzpatrick was seen carrying a knife before the stabbing occurred, but not afterward. Specifically, Fitzpatrick’s Pro Pizza employers, Bradford and De-gele, testified that during the time frame that Fitzpatrick worked for Pro Pizza he carried a knife on his person, but that after the stabbing they never saw that knife again. Degele, however, did not remember the last time he saw Fitzpatrick with the knife before the stabbing. According to Degele, he confronted Fitzpatrick regarding not carrying the knife after the stabbing, and Fitzpatrick indicated it would not be very smart to carry a knife around because the police were conducting a murder investigation.
During the investigation, Fitzpatrick made several statements to Detective Jeffrey Bousquet denying involvement in the crime. Fitzpatrick admitted that he picked Romines up at the 7-Eleven and dropped her off at the Sunny Palms Motel. Fitzpatrick denied ever seeing Romines again. Diane Fairbanks, who resided with Fitzpatrick at the time of the murder, and was still Fitzpatrick’s girlfriend at the time of trial, testified that Fitzpatrick was home between 12:30 and 1 a.m. on August 18, 1996, roughly the same time other witnesses testified to seeing Fitzpatrick with Romines leaving Howard’s house, [n.3] Fitzpatrick also denied having sexual intercourse with Romines, until the detective confronted him with the DNA results. At that point, Fitzpatrick admitted that he had sexual contact with Romines on August 17, 1996, between 9:30 a.m. and noon at the Water’s Edge Apartments. Fitzpatrick stated that he saw Romines at the dumpster at Water’s Edge and then they went to his house, had sexual intercourse on the couch, and he paid her twenty-five dollars. Bousquet also inquired whether Fitzpatrick would submit a blood sample to the police, which Fitzpatrick ultimately did. Evidence presented revealed that Fitzpatrick asked Dawn Moore, his sister who was a nurse, for a couple of vials of blood, Moore informed Fitzpatrick that she could not obtain blood samples for him.
[N.3.] Fairbanks also testified that she and Fitzpatrick went to bed together that night.
Id. at 503-06.
As a basis for imposing a sentence of death for the murder of Romines, the trial court found four statutory aggravating circumstances: (1) Fitzpatrick was under sentence of imprisonment or conditional/control release when the murder in this case was committed (great weight); (2) Fitzpatrick had previously been convicted of a violent felony (moderate weight); (3) *745 Fitzpatrick committed the murder during the commission of an involuntary sexual battery on the victim (little weight); and (4) the murder in this case was especially heinous, atrocious, or cruel (great weight). Id. at 526.
The trial court found the existence of two statutory mitigating circumstances: (1) the victim was a participant in Fitzpatrick’s conduct or consented to the act (little weight); and (2) other factors in Fitzpatrick’s background that would mitigate against the imposition of the death penalty. Under the statutory catchall provision the trial court accepted, considered, and weighed that Fitzpatrick: (1) had a good family background (great weight); (2) was doing well at his job when the murder in this case was committed (moderate weight); (3) had a long history of alcoholism and drug addiction and was apparently making strides to combat it (moderate weight); (4) served in the military but was given a general discharge under honorable conditions (no weight because of the reason for his general discharge); (5) had other mental and substance abuse problems which included an attempted suicide in 1995, a 1995 diagnosis of an adjustment disorder with depressed mood and situational depression, and alcohol and marijuana dependency (moderate weight); and (6) had no relationship with his natural child but established a caring, parental relationship with the children of his girlfriend (great weight). Id.
Finally, as nonstatutory mitigation, the trial court found that Fitzpatrick: (1) had shown considerable remorse for the death of the victim and appeared genuinely sorry for her death (moderate weight); (2) had long-term relationships with at least three women (great weight); and (3) was generally a friendly, warm, considerate person and had loyal friends and family (great weight). The trial court also found that the victim was a troubled young woman, but there was no evidence that she enticed Fitzpatrick into the acts he committed (no weight). Id. at 527.
We affirmed the convictions and sentence of death on direct appeal. Id.[1] However, we vacated Fitzpatrick’s sexual battery sentence and remanded the noncapital offense for resentencing because the State failed to prepare a guidelines scoresheet in violation of Florida Rule of Criminal Procedure 3.701(d)(1). Id. at 525-26.[2]
Postconviction Proceedings
On June 30, 2006, Fitzpatrick filed an initial eight-claim Motion to Vacate Judgment of Conviction and Sentence. After a *746 Huff[3] hearing, the postconviction court issued an order that granted an evidentiary hearing for some of Fitzpatrick’s claims, denied others without an evidentiary hearing, reserved ruling on others, and granted leave to amend the claims remaining. On March 5, 2007, Fitzpatrick filed a seven-claim Amended Motion to Vacate Judgment of Conviction and Sentence. The claims contained within that motion included allegations that trial counsel provided ineffective assistance of counsel in violation of Strickland[4] during both the guilt and penalty phases of Fitzpatrick’s capital trial. Fitzpatrick asserted that Florida’s capital sentencing statute as applied is unconstitutional and that the State will, by executing him, violate his Eighth Amendment right against cruel and unusual punishment because he may be incompetent at the time of execution. He further argued that the jury instructions unconstitutionally shifted the burden of proof to Fitzpatrick to prove that the death penalty was an inappropriate punishment and that execution by lethal injection is unconstitutional. Finally, Fitzpatrick alleged that the State could not execute him because he suffered from a major mental illness at the time of the offense.
The subclaims that alleged trial counsel was ineffective during the guilt phase included counsel’s failure to: (a) request the appointment of a second attorney to assist with the representation of Fitzpatrick; (b) call the court’s attention to a sleeping juror; (c) move for costs to retain a forensic investigator, and officially request authorization to excavate A. J. Howard’s real property before trial; (d) challenge and preserve for appeal the trial court’s erroneous response to three jury questions; (e) conduct a reasonable investigation and consult with experts in serology and DNA testing to refute the testimony of Rita Hall and Mary Ruth McMahan; (f) realize that the fingernail scrapings tested by the Florida Department of Law Enforcement (FDLE) came from the medical examiner’s office and not the SAVE kit, and have the nail scrapings from the SAVE kit tested; (g) investigate several witnesses and their relationship to Fitzpatrick’s case; (h) retain a forensic expert to review the hospital reports and forensic evidence concerning the quantity of discharge found within Ro-mines’ vagina and anus, the number of motile sperm found during the SAVE exam, and the apparent absence of semen on Romines’ underwear; and (i) retain a forensic pathologist to testify to the effect the medication had on Romines’ ability to understand and respond to Detective Bousquet’s questions at the hospital.
The subclaims that alleged trial counsel was ineffective during the penalty phase included counsel’s failure to: (a) investigate and accurately advise Fitzpatrick of available mitigation prior to Fitzpatrick’s decision not to present mitigating evidence; (b) request funds to have a mental health evaluation performed; (c) file and argue a motion to disqualify the trial judge; and (d) retain a forensic pathologist to testify with regard to the effects of ethanol in Romines’ system in relation to her ability to experience fear, sense danger, or feel pain. Fitzpatrick also claimed cumulative error during both the guilt and penalty phases of his trial.
The postconviction court granted Fitzpatrick an evidentiary hearing with respect to claims 1(a), 1(g), l(k), 2(a), 2(b), and 2(d). The court reserved ruling on claims 1(e), 1(f), l(j), and the allegation of cumulative error, and denied the remaining claims without an evidentiary hearing. *747 Thus, Fitzpatrick’s evidentiary hearing focused exclusively on claims that his trial counsel provided ineffective assistance during the guilt and penalty phases of his trial.
The evidentiary hearing occurred over the course of five days between October and December 2010. In addition to the testimony of trial counsel, the defense presented eight other witnesses. To support Fitzpatrick’s guilt phase ineffectiveness claims the defense presented: (1) Dr. Elizabeth Johnson, a forensic biology consultant with a specialty in DNA; (2) Angela Williamson and Andrea Borchardt-Gard-ner from BODE Laboratories;[5] (3) Dr. Daniel Spitz, a forensic pathologist and medical examiner; and (4) Robyn Rags-dale, a crime laboratory analyst supervisor with FDLE. To support Fitzpatrick’s allegations of penalty phase ineffectiveness, the defense presented three witnesses: (1) Mary Lewis, Fitzpatrick’s mother; (2) Dr. Robert Smith, a clinical psychologist and certified addiction specialist; and (3) Margaret Angel, the trial attorney’s investigator. The State presented two witnesses: (1) Ragsdale; and (2) Hall, an advanced registered nurse practitioner who testified as an expert during Fitzpatrick’s earlier criminal trial. At the close of the eviden-tiary hearing, the court found that Fitzpatrick had established both the deficiency and prejudice prongs of Strickland for claims 1(e), 1(f), l(j), l(k), 2(a), and 2(b), and had established cumulative error. As a result, the court vacated Fitzpatrick’s judgment of guilt of first-degree murder as well as his sentence of death and ordered a new trial.
This appeal by the State follows.
ANALYSIS
Strickland Standard of Review
The State’s first four claims on appeal challenge the postconviction court’s determination that counsel was ineffective during the guilt phase of Fitzpatrick’s trial. Ineffective assistance of counsel claims are evaluated in accordance with the United States Supreme Court’s decision in Strickland. We recently described what a defendant must establish to succeed on a claim that trial counsel was ineffective:
[T]he test when assessing the actions of trial counsel is not how, in hindsight, present counsel would have proceeded. See Cherry v. State, 659 So.2d 1069, 1073 (Fla.1995). On the contrary, a claim for ineffective assistance of trial counsel must satisfy two criteria. First, counsel’s performance must be shown to be deficient. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Deficient performance in this context means that counsel’s performance fell below the standard guaranteed by the Sixth Amendment. Id. When examining counsel’s performance, an objective standard of reasonableness applies, id. at 688, 104 S.Ct. 2052 and great deference is given to counsel’s performance. Id. at 689, 104 S.Ct. 2052. The defendant bears the burden to “overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ ” Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). This Court has made clear that “[strategic decisions do not constitute ineffective assistance of counsel.” See Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000). There is a strong presumption that trial *748 counsel’s performance was not ineffective. See Strickland, 466 U.S. at 669, 104 S.Ct. 2052.
Second, the deficient performance must have prejudiced the defendant, ultimately depriving the defendant of a fair trial with a reliable result. [Id. at] 689, 104 S.Ct. 2052. A defendant must do more than speculate that an error affected the outcome. Id. at 693, 104 S.Ct. 2052. Prejudice is met only if there is a reasonable probability that “but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Id. at 694, 104 S.Ct. 2052. Both deficient performance and prejudice must be shown. Id.
Bradley v. State, 33 So.3d 664, 671-72 (Fla.2010) (parallel citations omitted). Because Strickland requires that a defendant establish both deficiency and prejudice, an appellate court evaluating a claim of ineffectiveness is not required to issue a specific ruling on one component of the test when it is evident that the other component is not satisfied. See Mungin v. State, 932 So.2d 986, 996 (Fla.2006).
Furthermore, this Court examines ineffective assistance claims under a mixed standard of review because the performance and prejudice prongs of Strickland present mixed questions of both law and fact. Bradley, 33 So.3d at 672. Post-conviction courts hold a superior vantage point with respect to questions of fact, evidentiary weight, and observations of the demeanor and credibility of witnesses. See Cox v. State, 966 So.2d 337, 357-58 (Fla.2007). As a result, this Court defers to the postconviction court’s factual findings so long as those findings are supported by competent, substantial evidence. See Bradley, 33 So.3d at 672. However, we review the postconviction court’s legal conclusions de novo. Id.
Fitzpatrick’s Guilt Phase Claims
The postconviction court found defense trial counsel to be deficient during the guilt phase of Fitzpatrick’s trial based upon his failure to: (1) consult an expert in serology or DNA to refute the timing of Fitzpatrick’s sexual encounter with Ro-mines; (2) consult or hire a forensic pathologist to address (a) the apparent absence of semen on Romines’ underwear; (b) the quantity of discharge found in Ro-mines’ vagina and anus during the SAVE examination; and (c) the impact of sperm motility and the number of “motile” sperm discovered in Romines’ vagina upon the timing of the sexual encounter between Romines and Fitzpatrick; (3) retain a forensic pathologist or medical professional to testify concerning the effects of medication given to Romines at the hospital; and (4) realize which fingernail evidence was relevant and to seek testing on the fingernail scrapings taken from Romines during the SAVE examination. Although the postconviction court found an independent deficiency for each of the four guilt phase claims, the court determined that the first three claims were “intertwined in weighing the impact upon the possible outcome of the case.” The postconviction court also found that Fitzpatrick suffered prejudice with regard to the fingernail evidence.
Sperm Motility, Quantity of Discharge, and the Presence of Semen
The State challenges the postconviction court’s finding that trial counsel was ineffective during the guilt phase of Fitzpatrick’s trial for failing to consult an expert in serology or DNA and a forensic pathologist. These claims represented the bulk of Fitzpatrick’s postconviction challenges related to the timing of Fitz- *749 Patrick’s sexual encounter with Romines and the postconviction court’s conclusions with regard to these claims must be considered together. Counsel’s failure to conduct a reasonable investigation into sperm motility, the status of sperm on Romines’ underwear, and the fluid inside Romines are all directly related to counsel’s failure during trial to adequately challenge the State’s time frame on this dispositive issue. We conclude that with respect to these issues the trial court correctly found that trial counsel was deficient, and further that this deficiency prejudicially impacted the outcome of Fitzpatrick’s trial.
Timing and Motility[6]
Before trial, Fitzpatrick had initially denied having sexual intercourse with Ro-mines until he was directly confronted with DNA evidence demonstrating that his semen was found inside Romines. Fitzpatrick, 900 So.2d at 507. At that point, he admitted to having intercourse with Romines between the hours of 9 a.m. and noon on the day before Romines was discovered. Id. During trial, the State presented Mary McMahan, a senior crime lab analyst in the serology/DNA division of FDLE, to testify about the sperm found inside Romines. McMahan testified that Polymerase Chain Reaction (PCR) testing revealed that the DNA from the sperm matched Fitzpatrick’s known DNA profile to the exclusion of 612 million Caucasians, 5.9 billion African Americans, and 1.3 billion Hispanics. To determine the time frame during which the sperm were deposited inside Romines, McMahan testified that she microscopically examined the sperm and found “many to some” heads with tails still intact. On the topic of timing, the prosecutor asked McMahan:
PROSECUTOR: Now, this sperm itself — -when we talk about heads and tails, what are we talking about?
McMAHAN: The sperm is, of course, microscopic, and it’s a small organism or cell, really, where the DNA is contained within the head of the sperm. But the sperm also had a tail, which makes it motile, and that tail is much more fragile than the head is.
PROSECUTOR: Okay. And you say “makes it motile.” What do you mean?
McMAHAN: It can move.
PROSECUTOR: Move, swim?
McMAHAN: Right.
PROSECUTOR: Okay. So you have what I refer to as motile and nonmotile sperm, correct?
McMAHAN: Correct.
PROSECUTOR: And the nonmotile sperm would he the head by itself?
McMAHAN: Yes.
*750 PROSECUTOR: — that no longer possesses the capability of moving?
McMAHAN: Right.
[[Image here]]
PROSECUTOR: Based upon your observations of the sperm, motile and non-motile, in the vaginal swabs and on the slide, can you render an opinion as to how long prior to their removal from the vagina they had been deposited?
[[Image here]]
McMAHAN: Again, with the variance of time there, I would say the longest they could have been there would be, like, 15 hours [from when the SAVE kit was taken].
PROSECUTOR: At the very longest?
McMAHAN: Yes.
(Emphasis supplied.)
During the evidentiary hearing, Dr. Johnson, a forensic biology consultant with a specialty in DNA, reviewed the FDLE reports and the trial testimony of State forensic witnesses Hall, the nurse who conducted the SAVE examination, and McMa-han. Dr. Johnson testified that the prosecutor and McMahan made a “foundational flaw” by improperly interchanging the terms “motile sperm” with “sperm with a tail.” Dr. Johnson explained that motile sperm are sperm that have a tail and are capable of moving and swimming. Thus, motile sperm are a subset of sperm with tails. Motility is measured by placing the sperm on a wet mount slide to provide a liquid medium for the sperm to move. No wet mount slides were made in this case. Rather, Dr. Johnson testified that the slides made were actually air dry, which eliminated the possibility of evaluating the sperm samples for motility. Dr. Johnson further testified that sperm may lose motility but maintain its tail. In some cases, sperm that have existed for many years can be found on swabs in fabric. This fact, she explained, is why it was very inappropriate for McMahan to interchange the references to motile sperm with sperms with tails.
Fitzpatrick’s postconviction counsel also presented Dr. Daniel Spitz, a forensic pathologist and the chief medical examiner for Macomb and St. Clair Counties in Michigan. As chief medical examiner, Dr. Spitz oversees forensic nurse examiners to ensure proper evidence collection, and he is actively involved in a yearly seminar that teaches evidence collection to medical examiners, physicians, and forensic nurse examiners. He testified that the evidence collected yielded sperm, which showed both intact sperm — that is sperm that has a head with an intact tail — as well as sperm heads by themselves. Most of the sperm identified were sperm heads alone with a smaller amount of sperm heads with intact tails, which indicate that there was a period of many hours between the deposition of that material and the collection of the evidence. Sperm motility is lost within two to three hours after intercourse, and motile sperm are generally not present after sixteen hours. In contrast, Dr. Spitz noted that fifteen to eighteen hours is the generally accepted time frame between which the tails begin to separate from the heads. Here, the condition of the sperm indicated that the sexual encounter between Fitzpatrick and Romines occurred approximately twenty-four hours from the time of evidence collection, which was at approximately eight o’clock on the morning after Romines was attacked. Dr. Johnson concluded that McMahan’s confusion between “motile sperm” and “sperms with tails” directly contributed to McMa-han’s conclusion concerning the fifteen-hour time frame she placed on the sexual encounter between Romines and Fitzpatrick. As a result, she disagreed with McMahan’s conclusion, explaining that scientific research demonstrates that the *751 sperm in Romines could have been deposited from as early as twenty to forty-eight hours before the SAVE examination. Similarly, Dr. Spitz noted that McMahan’s fifteen-hour maximum time frame estimate was inaccurate because McMahan failed to take into consideration the more advanced degeneration of the sperm. Instead, Dr. Spitz testified that the evidence supported the conclusion that fifteen hours could be a minimum and not a maximum amount of time for intercourse between Fitzpatrick and Romines to have occurred.
Quantity of Discharge
Nurse practitioner Hall conducted a SAVE exam on Romines the morning she was discovered. On direct appeal, we summarized Hall’s testimony relating to this issue as follows:
Hall also examined and swabbed Ro-mines’ vaginal and anal areas. Hall concluded that sexual activity occurred within a fairly close proximity of time, a maximum of an hour or two, from when Romines was found.
Fitzpatrick, 900 So.2d at 504. Hall’s conclusion that intercourse between Romines and Fitzpatrick occurred within a couple hours of the attack was based primarily on her observations of fluid found inside Ro-mines. The colloquy between the prosecutor and Hall during trial with respect to this evidence reveals:
PROSECUTOR: Can you quantify the amount of the white fluid that you observed within the vaginal vault?
HALL: I have a note here that there was a white fluid.... I would expect that if a person has been sexually assaulted, and they walked around for any length of time, you lose evidence right away. The anal area, within an hour you have lost all the evidence, and within a couple of hours in the vaginal area. And in this particular instance, I saw fluid in both places. So it was my suspicion that this was a seminal fluid.[7]
PROSECUTOR: And ... assuming, rather, that it was a seminal fluid, the fact of the presence of a seminal fluid in the area of the anus was of greater importance to you then, was it not?
HALL: Yes. Because you just wouldn’t expect to find that.
PROSECUTOR: You found, I believe, in two locations, a brown fluid ... could you explain to the jury what it is you found, and where you found it?
HALL: As I was collecting the swabs of the fluid that was there, there was a brownish color to some of the fluids.... So I was assuming that it could have been the fluid like at the end of her period, a brownish discharge. But then when I did the anal area, I found the same substance that was there. So in trying to sort out what happened, what I felt it could have been is that maybe a penis went into the vagina and then into the anus, and that it was the tail end of her period where it would be menstrual flow, or it could have been trauma to the tissue, which also would have caused a brownish discharge.[8]
*752 Hall further testified that, based on the fluid found inside Romines: (1) sexual intercourse must have occurred within an hour or two of her attack because Hall “expected” that if a “person has been sexually assaulted, and they walk around for any length of time you lose evidence right away”; and (2) “maybe” a penis went into Romines’ anus and vagina because the same brownish fluid was present in both areas. Effectively unrebutted, we accepted Hall’s statements as true, stating in our opinion on direct appeal that the “Evidence presented at trial indicated that the amount of seminal fluid containing Fitzpatrick’s DNA found in the victim confirmed that sexual intercourse took place only one to two hours before she was found.” Fitzpatrick, 900 So.2d at 509 (emphasis supplied).
During the evidentiary hearing, both defense experts independently developed nearly identical conclusions with respect to Hall’s ability to reconstruct the timing and the circumstances of the sexual encounter between Romines and Fitzpatrick based on Hall’s evaluation of the amount of fluid found in Romines. Dr. Spitz testified that Hall’s determination that there was “a lot” of fluid was both a misevaluation of the evidence and not a scientific statement. He further testified that Hall improperly used the quantity of fluid to conclude that the sexual contact between Fitzpatrick and Romines was nonconsensual because the visual inspection of the quantity of a fluid provides insufficient information about sexual contact. Both experts indicated that the composition of a fluid must be determined by testing before a conclusion can be made with respect to whether the fluid discovered is indicative of sexual contact. Further, with regard to Hall’s testimony that intercourse must have occurred within a couple of hours because there was still a substantial amount of fluid inside Romines, Dr. Johnson noted that “[Hall] has, in other cases, collected fluids where she’s observed fluid and it turned out not to be semen. And that fluid, obviously, wasn’t removed ... by the activities the woman was engaged in.”
Absence of Semen on Romines’ Underwear
During trial, McMahan testified that she conducted both an acid phosphate test and microscopic sperm searches on Romines’ underwear to locate semen. Both tests produced negative results and McMahan therefore concluded that there was no indication of semen being present in Romines’ underwear. This conclusion was not affected by the presence of blood on Ro-mines’ underwear, as McMahan testified that the blood would have not completely removed the semen. Hall also testified during trial that there would have been seminal fluid on the underwear if Romines “had sex with someone, put on the panties, and then gone about her way.” Hall claimed that the absence of semen on Ro-mines’ underwear indicated that “whoever had sex with [Romines], it had to be a fairly close proximity in time, like an hour or two at the max, and that she never had the panties on afterwards.”
During the postconviction proceedings, the circuit court ordered BODE Laboratories to conduct independent testing on Ro-mines’ underwear. Dr. Angela Williamson, a forensic biology and DNA analyst who is employed as the director of forensic casework at BODE Laboratories, testified during the evidentiary hearing that BODE conducted a microscopic sperm search by dividing the underwear into an eleven-region grid.[9] Within those eleven regions *753 over 100 sperm heads were discovered, with sperm present in nine of the eleven regions. The DNA contained within the discovered sperm was later confirmed by a DNA analyst at BODE to be a single profile that matched the known DNA profile of Fitzpatrick to the exclusion of 1.8 quintillion Caucasians, 25 quintillion African Americans, and 150 quadrillion Hispanics in the United States.
Dr. Johnson established that blood on Romines’ underwear should not have affected FDLE’s ability to detect sperm. She further testified that if counsel had contacted her before trial with the FDLE results of Romines’ underwear, she would have advised him to hire an expert to perform independent laboratory testing because it is common for labs to miss sperm that is later discovered by a second lab’s testing. Dr. Johnson further testified that she was not sure how FDLE conducted the sperm search because BODE’s reports indicated that there were no cuttings on the underwear when they received them.[10] She noted that sperm searches involve careful examination, and FDLE’s inability to discover the sperm indicates that it may have followed the wrong procedure or failed to take the necessary time required to find the sperm.
Strickland Analysis with Regard to Sperm Motility, Quantity of Discharge, and the Presence of Semen
Deficiency
Fitzpatrick’s trial counsel represented him for four years before trial. During those four years, counsel had a professional obligation to investigate any potential impeaching or exculpatory evidence that may have assisted Fitzpatrick’s defense. See Bell v. State, 965 So.2d 48, 62 (Fla.2007). “One of the primary duties defense counsel owes to his client is the duty to prepare himself adequately prior to trial. ‘Pretrial preparation, principally because it provides a basis upon which most of the defense case must rest, is, perhaps the most critical stage of a lawyer’s preparation.’ ” Magill v. Dugger, 824 F.2d 879, 886 (11th Cir.1987) (quoting House v. Balkcom, 725 F.2d 608, 618 (11th Cir.1984)). Even before Strickland became the measuring stick for counsel’s effectiveness, courts across the country emphasized that an essential prerequisite to counsel’s presentation of an intelligent and knowledgeable defense is the requirement that counsel consult, investigate, and prepare for trial. Harris v. U.S., 441 A.2d 268, 272 (D.C.1982); see also Caraway v. Beto, 421 F.2d 636, 637-38 (5th Cir.1970) (“Our adversary system is designed to serve the ends of justice; it cannot do that unless [defense] counsel presents an intelligent and knowledgeable defense. Such a defense requires investigation and preparation.”)
Although “the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up,” Rompilla v. Beard, 545 U.S. 374, 383, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), postconviction evidence demonstrates that counsel’s preparation and performance were constitutionally inadequate, and his decisions before and during trial were not tactical or reflective of a reasonable trial strategy. Therefore, for the reasons that *754 follow, we conclude that counsel’s investigation here fell far short of the norms of professional conduct required by Strickland and hold that counsel failed to provide Fitzpatrick with constitutionally adequate representation.
The record repeatedly demonstrates that counsel did not adequately prepare himself to present an intelligent or knowledgeable defense with respect to the most important issue of Fitzpatrick’s trial: the timing of the alleged sexual encounter between Fitzpatrick and Romines. During trial, the State contended the only reasonable conclusion to draw from the evidence was that Fitzpatrick raped Romines, slit her throat, and left her to die on the side of the road. Counsel knew that the State intended to support this time line by highlighting its three scientific arguments: (1) the condition of Fitzpatrick’s sperm in the victim’s vagina indicated that the sexual encounter between Romines and Fitzpatrick occurred near the time she was attacked; (2) the lack of semen found on Romines’ underwear indicated that Ro-mines never wore her underwear after sexual intercourse with Fitzpatrick; and (8) the large amount of fluid inside Ro-mines indicated that the sexual encounter occurred near the time she was found. Based upon this evidence, the State argued during trial that Fitzpatrick’s version of the events was scientifically impossible.
Despite the scientific evidence that would implicate his client if not refuted, counsel failed to retain any forensic or medical experts. In fact, counsel filed his first request for a forensic expert after trial and only before the Spencer[11] hearing, which occurred fifty-three months after counsel was appointed to represent Fitzpatrick. During the fifty-three months that preceded counsel’s first concerted effort to hire a forensic expert, Fitzpatrick had been convicted of first-degree murder, and a jury had recommended that he be sentenced to death. During the postcon-viction evidentiary hearing, counsel testified that he vaguely recalled consulting with Dr. Feegle, a medical examiner, for thirty minutes before trial to discuss the forensic aspects of Fitzpatrick’s case.[12] This one tlmiy-minute conversation with Dr. Feegle was the only conversation counsel could remember and represented the entirety of his consultations with forensic experts during the forty-seven months counsel represented Fitzpatrick before trial. Counsel explained that after his thirty-minute undocumented conversation with Dr. Feegle, he declined to hire a forensic expert for trial because Dr. Feegle explained to him that “gravity” was a major problem for the defense, and that he would end up agreeing with the State’s analysis that it was likely that the intercourse had happened a short period of time before Romines was found.
With every effort to view the facts as counsel would have at the time, we cannot conclude that this single undocumented thirty-minute conversation with Dr. Feegle concerning the highly technical, and indisputably dispositive, scientific aspects of *755 Fitzpatrick’s trial constituted a reasonable investigation into the case against Fitzpatrick. The case against Fitzpatrick had significant weaknesses, yet counsel’s evi-dentiary hearing testimony and his performance during trial demonstrate that he was not sufficiently prepared to recognize or understand the science involved or those weaknesses. By failing to conduct a reasonable investigation into these issues, counsel inhibited his ability to know or discover whether the State’s experts made scientifically correct statements, or whether Romines’ underwear contained Fitzpatrick’s semen. If counsel had consulted a qualified expert, he would have been able to provide evidence to refute the State’s case through testimony indicating that the correct science supports the conclusion that Fitzpatrick’s sperm may have been deposited up to twenty-four hours before the SAVE exam. Competent, substantial evidence further supports the postconviction court’s finding that counsel’s trial performance with respect to Hall and McMa-han was conducted without any evident preparation, and without objection to inadmissible and inaccurate assertions by the prosecutor. State witnesses confused scientific terms, and made statements during trial that lacked a scientific basis. Despite these problems, counsel made no effort to challenge the State’s experts or the physical evidence against Fitzpatrick. Counsel did not object once during the testimony of Hall and McMahan despite the problems highlighted above, nor was he able to adequately challenge the mistakes in their testimony on cross-examination.
Counsel’s unpreparedness was further demonstrated during counsel’s evidentiary hearing testimony which indicated that at the time of Fitzpatrick’s trial, he did not understand th'e difference between motile and intact sperm. This fact alone exemplifies the objective unreasonableness of his performance. Had counsel recognized and understood these differences he could have conveyed that McMahan’s failure to distinguish between motile and nonmotile sperm directly impacted her ability to provide an accurate estimate of the timing of the sexual encounter with Fitzpatrick. Counsel also would have been able to convey to the jury that Fitzpatrick’s version of the events, as well as his fervent assertions of innocence, were not as farfetched as the State attempted to portray the facts.
The State’s experts testified during trial that Romines’ underwear exhibited no signs of Fitzpatrick’s semen, which strongly supported the State’s contention that intercourse between Romines and Fitzpatrick was nonconsensual and occurred shortly before she was discovered. However, postconviction testimony and testing revealed the exact opposite; that over 100 of Fitzpatrick’s sperm were discovered on Romines’ underwear. Postcon-viction testimony also established that McMahan’s report was unclear as to how she conducted a sperm search, and that if FDLE had tested properly it would have likely discovered Fitzpatrick’s sperm in Romines’ underwear. During the eviden-tiary hearing, trial counsel testified that he did not retest the underwear because he was “under the impression” that retesting would produce the same results.[13] Deci *756 sions rendered by counsel after a less than complete investigation are only reasonable to the extent that reasonable professional judgments support the limitations on investigation. Strickland, 466 U.S. at 690-91, 104 S.Ct. 2052. If counsel had retested the underwear, he would have learned that either: (1) no semen was found; (2) Fitzpatrick’s semen was found; or (3) another person’s semen was found. Thus, retesting would have either produced no new harmful evidence or dramatically benefit-ted Fitzpatrick’s case because finding Fitzpatrick’s semen — or the semen of another person — in Romines’ underwear would have supported Fitzpatrick’s claim that he had consensual sex with Romines earlier in the day. Despite these facts, the record demonstrates that counsel failed to meaningfully consult an expert or conduct anything more than a cursory investigation into the benefits and potential risks of retesting Romines’ underwear. Consequently, we conclude that counsel failed to exercise reasonable professional judgment when he approached this critical issue based upon only an “impression” that semen would not be found, and without consulting an expert about the possibility that FDLE’s testing could have missed semen. See Williams v. Thaler, 684 F.3d 597, 604 (5th Cir.2012) cert. denied, — U.S. -, 133 S.Ct. 866, 184 L.Ed.2d 679 (2013) (holding that defense counsel’s performance fell below an objective standard of reasonableness when counsel failed to “obtain any independent ballistics or forensics experts, and was therefore unable to offer any meaningful challenge to the findings and conclusions of the state’s experts, many of which proved to be incorrect”).[14]
The State contends that Fitzpatrick cannot establish deficient performance in light of counsel’s independent investigation and contemporaneous strategic decisions. The record does not support this contention because counsel’s independent investigation was ill conceived, improperly executed, and added nothing to Fitzpatrick’s defense. Counsel testified that he conducted his own forensic investigation at the University of South Florida library. He found an article from the *757 Metropolitan Police Forensic Academy in London, which would have supported an extended timeline for the sexual encounter between Fitzpatrick and Romines. However, instead of presenting scientific studies through his own expert, counsel attempted to introduce the study during his cross-examination of McMahan. This attempt was prevented by the prosecution’s objection, which was sustained by the trial court. While it is counsel’s responsibility to educate themselves about the aspects of a case they do not understand, gaining personal knowledge of a subject does not end counsel’s obligation to his or her client. Counsel must apply the knowledge gained in a way that provides his or her client with evidence and constitutionally adequate legal representation. Here, even if we were to assume that counsel spent hours independently researching the scientific aspects of Fitzpatrick’s case, he did not utilize this scientific knowledge in a way that meaningfully benefitted Fitzpatrick during his trial.
In sum, counsel did not adequately prepare himself to either present the necessary evidence in support of Fitzpatrick’s defense through the testimony of experts, or challenge the State’s forensic evidence. He did not uncover available exculpatory evidence because he did not make a sufficient effort to understand the forensic details of the physical evidence that purportedly supported Fitzpatrick’s guilt. Finally, he lacked the requisite knowledge to effectively cross-examine the State’s experts on their scientifically inaccurate testimony. For these reasons, we hold that counsel was deficient.
Prejudice
The postconviction court found that counsel’s errors on this issue prejudiced Fitzpatrick because they:
[P]ermitted the development by the State of an inaccurate timeline of when the defendant may have had sex with the victim and when she was stabbed and found wandering the streets.
[[Image here]]
The reasonableness and likelihood of a different result is all the more evident upon an examination of the reliance by the Supreme Court on the limited, virtually uncontroverted evidence during the guilt phase. Contrasted with the evidence introduced during the 3.851, it would have been reasonably expected to persuade a jury (and the Supreme Court) that the evidence did not support the murder verdict.
(Footnote omitted.)
The State, by its own admission, has repeatedly characterized the strongest evidence of Fitzpatrick’s guilt as: (1) the discovery of Fitzpatrick’s sperm in Ro-mines; (2) the lack of Fitzpatrick’s sperm on Romines’ underwear; and (3) the expert testimony that scientifically linked Fitzpatrick’s sexual encounter to a timeline consistent with the State’s position — that Fitzpatrick raped Romines, slit her throat, and then dumped her on the side of the road shortly before she was found — and inconsistent with the alternative consensual sex timeline presented by Fitzpatrick. In fact, the State directly told the jury that this evidence was critical to securing a conviction during closing argument:
All right. Let’s go at it this way. Let’s forget Steve Kirk. Let’s forget A.J. Howard, Melanie Yarborough, Cindy Young, Jeff Bousquet, Stacey Morrison and Arnold. Everybody but three folks and one piece of evidence.
Let’s forget the statements made by Fitzpatrick. The identifications made by the people in this courtroom. By Cindy Martin — or Cindy Young, who could or could not identify him, by A.J. [Howard], by Melanie, by Diane Fairbanks. Forget it all. You have the *758 right to believe or disbelieve any witness you want to. But I would suggest to you that the testimony of Lee Miller, the medical examiner, Dr. McMahan, and Rita Hall have not been damaged.
Dr. McMahan says this is not an exact science. I cannot tell you specifically. I can tell you that the literature in my experience to date ... indicates that you will find live, motile sperm up to fifteen hours after it’s been deposited.
Whoever, therefore, according to Dr. McMahan, had sex with this lady, had sex with her sometime fifteen hours preceding 8:00 a.m. on the morning of the 18th.
Rita Hall, based upon my examination of Laura Romines and the amount of semen that I saw, not only in the vaginal cavity, but in the anus, I’m telling you that no more than an hour. At most, two.
Okay. Lee Miller, doctor. Forensic Pathologist. The wounds that were inflicted upon Laura Romines, these incised wounds of her throat, were inflicted a very short period of time before she was discovered. Very short. Otherwise, she would have bled out.
Dr. McMahan says, notwithstanding the cross examination, there is no semen in those panties. There was none revealed by the Woods Lamp. There was none revealed by the scientific test that I was performing. There was none.
She did not have her panties on after she was raped. If she had — and again, underlying the amount [of] seminal fluid that was found in her body, the fact that there was that much by itself ... the law of gravity indicates that if she’s on her feet, it’s going to drip out. It’s just that indelicate, but it’s true.
There is no semen in her panties. Her panties were removed. She had sex, and she never put them back on, because they were around her waist. If she had had sex before these wounds were inflicted upon her body, there would be A, less semen in her than there was. Or B, semen in her panties. And you don’t have either one of them. Whoever stabbed her had sex with her right then and there, and that is him.
Forget A.J., forget Melanie, forget Steve Kirk. Look at the panties. Look at the medical evidence. Look at the scientific evidence. And the only person you have is Michael Peter Fitzpatrick. It is physically, scientifically impossible for there to have been anyone else involved.
(Emphasis supplied.)[15] The prosecutor’s closing argument demonstrates the State’s near exclusive reliance on forensic evidence to support Fitzpatrick’s guilt. These statements also demonstrate how substantially different Fitzpatrick’s trial would have been if counsel did not provide constitutionally deficient representation on this issue. If counsel had performed effectively with respect to this claim, the prosecutor would not have been able to argue to the jury that the credibility of McMahan and Hall had not been challenged. He would not have been able to tell the jury to forget all the nonforensic testimony, that “there is no semen in [Romines’] panties,” or that it was “scientifically impossible for there to have been anyone else involved” in Romines’ murder other than Fitzpatrick.
*759 Fitzpatrick has presented, through post-conviction testing and testimony, substantial evidence that undermines confidence in the outcome of his trial. First, contrary to the State’s assertion at trial, Fitzpatrick’s semen was discovered in Romines’ underwear.[16] This evidence, if presented, could have directly impacted a reasonable view of Fitzpatrick’s guilt because it supported Fitzpatrick’s claim of consensual sex in the morning before Romines was attacked. Second, postconviction testimony revealed that the prosecutor and McMahan made a foundational flaw by improperly interchanging the terms “motile” and “intact” sperm when testifying about the timing of the sexual encounter between Romines and Fitzpatrick. FDLE did not conduct a measurement for motility, and motility should never have been mentioned at trial. McMahan’s misunderstanding of the difference between “intact” and “motile” sperm indicates that the basis for her conclusion that sexual contact occurred between Fitzpatrick and Romines a maximum of fifteen hours before the SAVE examination was incorrectly premised on a motility time frame instead of the longer time frame associated with sperm degeneration. Third, both Dr. Spitz and Dr. Johnson, two witnesses expressly found to be credible by the postconviction court, testified that the evidence indicated that the sexual encounter between Romines and Fitzpatrick could have occurred twenty-four hours before the SAVE examination. This testimony directly contradicts the State’s timeline and supports Fitzpatrick’s timeline of consensual sex. Fourth, several of Hall’s statements regarding the amount of fluid inside Romines were not accurate evaluations of the facts at hand, were well outside the realm of her expertise, and lacked a scientific basis.
In light of the severity of these errors and the dispositive nature of this issue, counsel’s deficient performance significantly undermines confidence in the outcome of Fitzpatrick’s trial. Had he not been ineffective, the jury would have received substantial evidence that supported Fitzpatrick’s claim that he had consensual sex with Romines earlier in the day and that he was not the one who attacked Romines. Consequently, we agree with the postcon-viction court that counsel’s shortcomings deprived Fitzpatrick of constitutionally adequate legal representation and hold that Fitzpatrick has met his burden to demonstrate that counsel performed ineffectively with respect to this claim. Based on this claim alone, Fitzpatrick is entitled to a new trial.
Sexual Assault Testimony of Rita Hall
The primary purpose of Hall’s trial testimony was to establish the underlying felony of sexual battery, which provided a statutory basis for the State to seek the death penalty through a charge of felony murder. In addition to providing her “expert” opinions on the significance of the fluid found inside Romines, Hall expressed opinions specifically with regard to her interpretation of Romines’ injuries and whether the sexual encounter between Fitzpatrick and Romines was nonconsensual. This Court summarized Hall’s testimony with respect to this evidence as follows:
Rita Hall, an advanced registered nurse, who was accepted by the trial court as an expert in the field of the examination of sexual assault victims, conducted the SAVE [examination] on *760 Romines at the hospital. Hall testified that she found a bloody undergarment wrapped around Romines’ waist near her breasts, Romines’ breasts were deep purple, there was a penetrating wound in the breast area that was either another stab wound or a bite mark, there was puffiness around her head, there was bruising on her arms, her legs were covered in scratches, and there was a cigarette burn on her leg.
[[Image here]]
Hall detected several areas in the vagina and anus that were either a very deep pink or red, indicating there was pressure from something penetrating the areas. In addition, Hall testified that her findings were consistent with forced sexual activity; however, she could not determine conclusively if the sexual activity was forced. Further, the evidence established that the DNA profile developed from Romines’ vaginal swabs was consistent with the DNA profile that was developed from Fitzpatrick’s blood sample.
Fitzpatrick, 900 So.2d at 504.
In stark contrast to the trial proceedings, Hall’s qualifications as an expert were heavily contested during the postcon-viction process. During trial, Hall was accepted as an expert in the field of examination of sexual assault victims without voir dire or objection. During the eviden-tiary hearing, counsel testified that he did not challenge Hall’s qualifications because he was “under the impression” that she was qualified to testify. In light of the critical nature of Hall’s testimony, this statement alone is illustrative of counsel’s ineffectiveness. However, additional record evidence supports our conclusion that he was ineffective for failing to challenge Hall’s qualifications and testimony. Specifically, during the evidentiary hearing, Dr. Spitz testified that forensic nurse examiners, like Hall, have little to no involvement in the interpretation of the evidence. He further testified that Hall exceeded the scope of her expertise and provided “very misleading” testimony by interpreting Ro-mines’ injuries. Several portions of Hall’s expert opinion evidence were incorrect or misleading.
Bite Mark
Hall testified during trial that Romines’ breasts were deep purple with a penetrating wound that was either a stab wound or a bite mark. Dr. Spitz testified that the wound Hall characterized as a bite mark was not in fact a bite mark, but instead nothing more than a nonspecific bruise which could have been caused in many ways.[17] Consequently, he concluded that Hall misled the jury by characterizing the wound as a sharp-force injury, i.e., a stab wound, a bite mark, or even a potential bite mark, because it lacked the necessary characteristics.
Cigarette Burns
During trial, Hall also described another of Romines’ injuries as cigarette burns, or as round burns to Romines’ pubic area. Dr. Spitz testified during the evidentiary hearing that he would not characterize the wounds as cigarettes burns, as one of them was showing clear signs of healing, which indicated that the wound existed well before the attack in question. Dr. Spitz also testified that Hall improperly limited the *761 scope of the opinion to a cigarette burn to the exclusion of all other conditions, including some natural diseases, such as syphilis, that can cause similar looking wounds.
Anal Intercourse
During trial, Hall testified that she believed that Fitzpatrick had anal intercourse with Romines because: (1) a brownish fluid found in Romines’ anus and vagina indicated that a penis may have entered into the vagina and then into the anus; and (2) there were increased signs of color in the anus which indicated pressure had been applied from something penetrating the area. Hall also testified that she placed a swab in Romines’ anus and recovered three sperm heads from deep within the anal cavity, which indicated that anal intercourse had occurred.
Dr. Spitz testified that this evidence did not establish anal intercourse. Instead, both Dr. Johnson and Dr. Spitz explained that there was a strong probability that the evidence collected from Romines’ anus had been contaminated by fluid draining from the vagina into the anal cavity. Dr. Spitz also noted that Hall’s conclusion that anal intercourse occurred because she placed a swab in through the anus and recovered specimens from deep within the anal cavity was completely without scientific basis. He testified that once a swab is placed against the outside of the anus there would have been no way for Hall to have known whether those three sperm heads were in fact collected from the outer portion of the anus or from deeper within the anal cavity. Dr. Spitz also disagreed with Hall’s conclusion that there was penetration based on the increased tissue col- or near the anus.
Forced Sexual Contact
Based upon Hall’s interpretations of Ro-mines’ injuries, Hall testified that she could definitively conclude that Romines had vaginal and anal intercourse with someone. Although Hall could not definitively conclude that this sexual activity was nonconsensual, her trial testimony strongly indicated that she believed, in her “expert” opinion, that the sexual activity was forced. During the evidentiary hearing, Dr. Spitz testified that the evidence presented during trial did not establish forced sexual contact, and that Hall lacked sufficient credentials and expertise to render conclusions about forced sexual contact, especially in light of the findings that she identified. He noted that a determination of a forced sexual encounter could be made when there are very traumatic injuries, lacerations, severe bruising, or tearing. However, when there is no injury, or very subtle redness or other nonspecific findings, the conclusion of a forced sexual encounter, or even a sexual encounter at all, based on Hall’s examination of Romines, was not only premature, but inappropriate.
Strickland Analysis for Sexual Assault Testimony
Deficiency
Because Hall testified during trial both to the timing of the sexual encounter between Romines and Fitzpatrick and to the character of the injuries Romines sustained, most of the same problems with regard to counsel’s ineffective performance apply to both issues. Both reflect a lack of investigation, preparation, and a failure to hire or consult an expert to rebut the State’s scientific evidence against Fitzpatrick. The postconviction court found that Hall was unqualified to interpret and evaluate Romines’ injuries, specifically noting that Hall “made assumptions, ‘felt’ things ‘could have been ... maybe ...’, had ‘suspicions’, ‘appeared to be ... ’ — all as to critical findings outside the area of her expertise and without scientific basis.” Competent, substantial evidence supports *762 the court’s finding that Hall was unqualified to interpret and characterize Romines’ injuries.
Ineffective assistance of counsel can be established when counsel fails to investigate the qualifications of a witness. See Bottoson v. State, 674 So.2d 621, 622 (Fla.1996); see also State v. Jackson, 725 So.2d 1234, 1236-37 (Fla. 2d DCA 1999). Because the purpose of Strickland is to ensure that the adversarial testing process works to produce a just result for every defendant, we are not confined to compare counsel’s actions against only the actions of counsel in other capital cases. See Strickland, 466 U.S. at 687, 104 S.Ct. 2052. Rather, in the context of Strickland, a defendant’s right to a fair trial is unassailable regardless of the crime charged. See id.; see also Chavez v. State, 12 So.3d 199, 211 (Fla.2009) (noting that the Sixth Amendment guarantees all defendants the right to adequate legal assistance).
In that light, we find the errors and missteps in this case to be analogous to those in State v. Thomas, 109 Wash.2d 222, 743 P.2d 816 (1987). In Thomas, the defendant was arrested for eluding a police vehicle and driving under the influence of alcohol. Id. at 817. Defense counsel presented a witness to testify as an expert in the science of alcohol-related blackouts. Id. at 820. However, counsel did not investigate the witness’s background, and it was discovered that the witness was not qualified to testify as an expert. Id. at 820-21. The Washington Supreme Court noted that generally the decision to call a witness will not support a claim of ineffective assistance, however, the presumption of counsel’s competence can be overcome by a showing, among other things, that counsel failed to conduct an appropriate investigation into a witness’s qualifications. Id. at 820.
In Thomas, the court held that trial counsel was deficient when it became apparent that counsel was completely unaware of his “expert’s” lack of qualifications during his questioning of the witness during voir dire. Id. at 821. Here, there is no evidence to indicate that counsel investigated Hall’s qualifications. In fact, the record reflects the opposite. Counsel’s trial performance and evidentiary hearing testimony demonstrate that he never considered challenging Hall’s qualifications. He did not voir dire Hall or object to her qualifications simply because he was under the impression she had been recognized as an expert in the past. Postconviction evidence established that Hall’s responsibilities were to collect, not evaluate or interpret, evidence. Hall misled the jury by mischaracterizing Romines’ wounds as a bite mark and a cigarette burn, and her basis for determining that anal intercourse occurred was unfounded. Nothing in Hall’s background indicated that she was qualified to make a determination as to whether the sexual contact between Fitzpatrick and Romines was nonconsensual, and the evidence did not support her conclusion that forced sexual contact occurred. If counsel had conducted a minimal investigation into Hall’s qualifications, he would have discovered the limitations of her expertise. By incorrectly assuming that Hall was qualified to interpret Romines’ injuries, he failed to prevent Hall from painting a picture in the minds of the jurors of a victim who was vaginally and anally raped, stabbed, burned, and bitten. After Hall’s bleak characterization of Romines’ injuries on direct examination, nothing counsel did during his cross-examination of Hall erased this horrific picture from the minds of the jurors.
We do not hold that every time the trial court determines, during the postconviction proceedings, that an expert witness who testified at trial was not qualified *763 necessarily means that counsel’s performance in not challenging the witness’s qualifications is thereby deficient, however, counsel must conduct some minimal investigation into the qualifications of testifying witnesses. Based on the evidence presented during the postconviction proceedings, we conclude that trial counsel performed deficiently when he failed to challenge Hall’s qualifications to interpret Romines’ injuries.
Prejudice
This Court’s substantial reliance on Hall’s trial testimony in affirming Fitzpatrick’s convictions on direct appeal demonstrates why Fitzpatrick was prejudiced by counsel’s failure to challenge her qualifications or ability to interpret Romines’ injuries. See Fitzpatrick, 900 So.2d at 506-09, 524. Not only was Hall an expert whose testimony was summarized in our opinion, but her testimony was also directly relied upon as a basis for denying three of Fitzpatrick’s claims on direct appeal. Id.
First, Fitzpatrick asserted on direct appeal that the trial court erred in denying his motion for judgment of acquittal because the circumstantial evidence presented during trial was not inconsistent with Fitzpatrick’s theory of innocence. Id. at 506. In denying Fitzpatrick’s claim, this Court specifically relied on Hall’s testimony that “numerous injuries and markings to Romines’ body [] led her to conclude that Romines had suffered forced sexual activity. Hall also concluded that the sexual activity occurred within a fairly close proximity of time, a maximum of an hour or two, before Romines was found.” Id. at 507. Consequently, we held that competent, substantial evidence supported Fitzpatrick’s conviction due, in part, to Hall’s conclusions that
Fitzpatrick was the last person seen with Romines alive three hours before she was discovered on the side of the road, there was DNA evidence matching Fitzpatrick to the source of the semen recovered from Romines, and evidence revealed that Romines had what was likely a forced sexual encounter two hours before her death.
Id. at 507-08 (emphasis supplied).
Second, Fitzpatrick claimed the trial court erred in denying his motion for judgment of acquittal on the charge of felony murder because the State did not present sufficient evidence to support the underlying felony of sexual battery. Id. at 508-09. We denied Fitzpatrick’s claim and concluded that:
Evidence presented at trial indicated that the amount of seminal fluid containing Fitzpatrick’s DNA found in the victim confirmed that sexual intercourse took place only one to two hours before she ivas found. The evidence established that Fitzpatrick’s sexual encounter with the victim occurred between 1 a.m. and 3 a.m. on August 18.
Further, Fitzpatrick’s contention that sexual intercourse with the victim was consensual was contravened by the circumstances under which the victim was found. Specifically, the victim was found naked with her bloody undergarment wrapped around her waist near her breasts, her breasts were deep purple, and there was a penetrating wound in the breast area that was either another stab wound or a bite mark, puffiness around her head, bruising on her arms, scratches covering her legs, and a cigarette bum on her leg. The State presented competent, substantial evidence from which the jury could find that there was sufficient evidence that the killing occurred during a sexual battery, and therefore the trial court did not err in denying Fitzpatrick’s motion for judgment of acquittal.
*764 Id. at 509 (emphasis supplied; citations and footnote omitted).
Finally, Fitzpatrick alleged that he was entitled to a new penalty phase proceeding because the jury considered sexual battery as an aggravating circumstance when the evidence was insufficient to submit the sexual battery charge to the jury for a verdict. Id. at 524. This Court again denied Fitzpatrick’s claim relying on the same evidence of sexual battery mentioned above. Id.
We detail our reliance on Hall’s testimony because it exemplifies the materiality of that testimony and how ineffective assistance compromises not only the trial, but the entire judicial process. The Sixth Amendment ensures that all defendants are provided with the assistance necessary to justify reliance on the outcome of the proceedings. Strickland, 466 U.S. at 691-92, 104 S.Ct. 2052. Thus, a fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding, and a finding of ineffectiveness is only proper when counsel’s conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. Id. at 685, 104 S.Ct. 2052.
In this case, Fitzpatrick has established prejudice by demonstrating that counsel’s failure to challenge Hall’s qualifications and testimony had a concrete and substantial impact on the guilt phase of Fitzpatrick’s trial sufficient to undermine confidence in the jury’s verdict. If counsel had either: (1) made a reasonable effort to challenge Hall’s ability to characterize and interpret Romines’ injuries; or (2) presented an expert to testify that the conclusions Hall expressed lacked a scientific base and did not support forced sexual conduct, the State would have had a significantly more difficult time advancing both its felony murder theory of the crime and the sexual battery aggravating circumstance. Furthermore, without Hall’s testimony the jury would not have received evidence that Romines was vaginally and anally raped, stabbed, burned, and bitten. Based on the materiality of Hall’s testimony, we cannot say that counsel’s representation of Fitzpatrick with respect to this issue provided Fitzpatrick with an “ ‘ample opportunity to meet the case of the prosecution’ to which [he] was entitled.” Id. at 685, 104 S.Ct. 2052 (citing Adams v. U.S. ex rel. McCann, 317 U.S. 269, 275, 63 S.Ct. 236, 87 L.Ed. 268 (1942)). Counsel’s failure to challenge Hall’s qualifications and testimony had a sufficiently material impact on Fitzpatrick’s trial to undermine confidence in the outcome. Therefore, we affirm the postconviction court’s conclusion that counsel was ineffective with respect to this claim.
Failure to Retain a Medical Professional to Testify on the Effect of Medications Given to Romines at the Hospital
Before her death, Romines provided varying accounts of her attacker. Fitzpatrick, 900 So.2d at 503-04. Romines initially indicated at the scene that her attacker was “Steve,” a thirty-year-old male from Water’s Edge Apartments. Id. These statements were admitted during trial as excited utterances. Id. at 515. At the hospital, two detectives asked Romines if “Steve” had attacked her and she shook her head no. Id. at 504. The trial court admitted this statement along with other nonverbal statements by Romines made at the hospital that indicated “Steve” was not her assailant. Id. at 515. On direct appeal, Fitzpatrick challenged the admission of Romines’ hospital statements. Id. We held that the trial court had properly ad- *765 raitted Romines’ statements at the hospital.
During the postconviction evidentiary hearing, evidence was presented that Ro-mines was intoxicated and suffering from severe trauma when she was found on the side of the road. Despite her injuries, the evidence established that Romines was able to understand questions presented to her and verbalize answers that were appropriately responsive. It was also established that when Romines was admitted to the hospital, she was given morphine and Ativan for sedative purposes and pain control. Ativan is an anti-anxiety sedative medication and is sometimes used to keep patients who need assistance breathing sedated following surgical intervention. The medication given to sedate Romines played a role in impairing her cognitive ability. Further, police reports taken while Ro-mines was in the hospital reflect that one officer stopped questioning her because he was concerned that Romines did not understand his questions. Overall, competent, substantial evidence supports the conclusion that Romines was suffering from impaired cognitive functioning due to the effects of medication, and was having difficulty breathing and remaining in a conscious state during the time she was questioned by police at the hospital.
Strickland Analysis of Effects of Medication Claim
The postconviction court concluded that counsel was deficient for not retaining an expert to testify on the effects of medication given to Romines at the hospital. The court also held that prejudice was established in conjunction with Fitzpatrick’s other claims that challenge the timing of his sexual encounter with Romines. Specifically, the court noted that if counsel had retained a proper expert the “jurors would have more medical testimony to consider in weighing the reliability of [Romines’] statements in light of the impact of the medication.”
Although this claim is similar to Fitzpatrick’s other postconviction claims involving counsel’s failure to consult or retain forensic or medical experts, this claim greatly differs from Fitzpatrick’s other claims because the jury had a more comprehensive understanding of the evidentia-ry circumstances surrounding Romines’ condition at the scene and in the hospital. Unlike Fitzpatrick’s other claims, where the jury was unaware of the fact that the State’s expert witnesses had provided false and misleading testimony during trial and that scientific evidence supported Fitzpatrick’s time line of events, here the jury knew that Romines’ initial statements identifying “Steve” as her assailant were made while she was intoxicated and suffering from severe trauma. The jury knew that forensic evidence exculpated Steve Kirk — the primary “Steve” suspect — as the source of the semen found inside Ro-mines. Fitzpatrick, 900 So.2d at 503 n. 1. The jury was also aware that Romines’ nonverbal statements at the hospital were made while she was medicated and unable to remain in a fully conscious state. Id. at 515 n. 7. Counsel was not deficient for failing to present testimony that was largely cumulative and would have only marginally impacted the jury’s understanding of Romines’ condition at the scene and in the hospital. See Whitfield v. State, 923 So.2d 375, 380 (Fla.2005) (holding that the failure to call certain witnesses was not ineffective assistance because witnesses had already presented similar evidence and “counsel is not required to present cumulative evidence”); see also Darling v. State, 966 So.2d 366, 378 (Fla.2007).
Further, we conclude that even if Fitzpatrick was able to establish that counsel was deficient, this deficiency would not undermine confidence in the outcome of *766 his trial. The jury was presented with a nearly complete picture of the circumstances under which Romines made these statements. The postconviction testimony provided only slightly greater detail about the medication prescribed to Romines, the effect the medication had on her mental state, and the impact of medical devices on her ability to communicate. Thus, while the postconviction court was correct in its assertion that if an expert had testified about Romines’ condition at the hospital, the jury may have had “more medical testimony” from which it could weigh the reliability of Romines’ statements, it incorrectly concluded that by not presenting “more” testimony counsel was ineffective. To the contrary, ineffectiveness under Strickland, is not judged by the quantity of evidence presented to the jury, but whether the quality of the evidence not presented sufficiently undermines confidence in the outcome of the proceeding. Here, the evidence adduced during the evidentiary hearing provided minimal additional insight in light of the evidence already presented about Romines’ condition at the scene and in the hospital. Therefore, we hold that there was no prejudice for counsel’s failure to present an expert to testify on the effects of medication given to Ro-mines.
Failure to Seek Testing On Fingernail Evidence Collected by the Medical Examiner
During both the trial and postconviction proceedings, there was a significant amount of confusion surrounding which fingernail evidence was relevant. This confusion stemmed from the fact that fingernail samples were collected twice. On the morning that Romines was attacked, Hall obtained samples from Romines’ fingernails during the SAVE examination. Eighteen days later, the medical examiner was able to collect a larger sample of fingernail evidence during Romines’ autopsy.
During opening statements at Fitzpatrick’s criminal trial, counsel told the jury that FDLE analyst Ragsdale conducted PCR testing on the fingernail scrapings taken by Hall during the SAVE examination. The tissue found in those scrapings, he argued, did not match the DNA profile of Fitzpatrick, Steve Kirk, or Romines. Contrary to this statement to the jury, Ragsdale did not conduct PCR testing on the DNA evidence from the SAVE kit, but rather examined the fingernail samples removed from Romines’ hand during the autopsy. Because counsel confused the SAVE examination fingernail evidence with the autopsy fingernail evidence, when he attempted to present the testimony of Ragsdale concerning the DNA found from the autopsy fingernail evidence, the trial court sustained the State’s objection because counsel failed to authenticate the autopsy fingernail evidence when the crime scene technician — who was the only person who could authenticate the autopsy fingernail evidence — was presented to testify.[18]
*767 Counsel then was forced to proffer Ragsdale’s testimony outside the presence of the jury. During the proffer, Ragsdale testified that the DNA recovered from the fingernail scrapings during the autopsy indicated
the victim could be eliminated from the DNA mixture tested from her right hand, but neither Fitzpatrick nor Stephen Kirk could be eliminated; both Fitzpatrick and Stephen Kirk could be eliminated from the mixture tested from her left hand but the victim could not be eliminated; there was evidence of the DNA of another, unknown person in the tissue from the right hand clippings; and the DNA evidence under the victim’s fingernails could have been there for a long period of time, depending on when she had last washed her hands or cleaned her nails.
Fitzpatrick, 900 So.2d at 521. The trial court concluded that the proffered evidence was “of a nature that it would be irrelevant and immaterial in its composition and I would not allow it into evidence, even if ... the clippings were found, for the reason that the proffered evidence is inconsequential and does not lead to any conclusion of any kind.”
On direct appeal, this Court denied Fitzpatrick’s challenge to the trial court’s exclusion of fingernail scrapings, and held
Assuming, without deciding, that the testimony with regard to the fingernail scrapings was relevant, we conclude that any error in its exclusion was harmless. The proffered testimony did not establish any material conclusion due to the expert’s inability to accurately determine how long the DNA had been under the victim’s fingernails. The proffered evidence also failed to eliminate Fitzpatrick. The tissue from the unknown person could have been explained through the trial testimony of [first responder] Dwayne Mercer, who testified that when he was with the victim at the crime scene she squeezed his arm and her fingernails went into his flesh.
Id. (citation omitted).
During the postconviction proceedings, Fitzpatrick’s amended motion claimed counsel was ineffective for his failure to determine that the fingernail clippings tested by FDLE came from the medical examiner’s office and for failing to move to have the nail scrapings from the SAVE kit tested. The postconviction court ordered both sets of fingernail scrapings to be tested by BODE. The DNA uncovered from the nail scrapings in the SAVE kit did not produce the male “Y” chromosome marker and, therefore, no further testing was done. As a result, Fitzpatrick did not rely on the fingernail scrapings taken from the SAVE kit to support his fingernail DNA claim. Instead, the evidentiary hearing testimony with regard to this claim focused solely on the DNA testing of Ro-mines’ fingernail evidence taken at the medical examiner’s office during the autopsy, which was tested by Ragsdale before trial and retested by BODE during the postconviction proceeding.
During the evidentiary hearing, Dr. Williamson testified that a single-source full male . DNA profile was discovered on the medical examiner’s fingernail evidence derived from Romines’ right hand. From that profile, Fitzpatrick, Kirk, and Ro-mines were excluded. On another sample, BODE was able to discover a mixed DNA profile between at least two individuals, with one contributor being Romines. Both Fitzpatrick and Kirk were excluded from the second sample. Ragsdale testified that she tested first-responder Mercer’s DNA against the single-source male DNA profile discovered by BODE from Ro-mines’ right hand. Mercer’s DNA did not match the DNA found by BODE.
*768 Dr. Williamson testified that BODE discovered these DNA profiles using Short Tandem Repeat (STR) testing, which was available at the time of Fitzpatrick’s trial, and has been routinely used in laboratories throughout the world. Dr. Williamson testified that FDLE used DQ alpha testing on the same evidence before trial and was unable to exclude Fitzpatrick as a possible contributor. FDLE’s inability to exclude Fitzpatrick is due in large part to the fact that DQ alpha testing is a less discriminatory testing procedure than STR testing because it examines only six loci on individual chromosomes, while STR testing examines 13 loci. Although the fingernail evidence was originally tested with DQ alpha testing, FDLE switched to STR testing in 1999, two years before trial; however, counsel never requested the retesting of the DNA profile found on Romines’ right hand to determine if Fitzpatrick could be eliminated as a contributor. Ragsdale testified that the evidence uncovered by BODE — that there was a single, and not mixed, full male DNA profile that did not match Fitzpatrick, Kirk, or Mercer under Romines’ right fingernails — could have been discovered by FDLE before trial using the STR method.
Postconviction testimony also established that the size of the tissue recovered from Romines’ right hand was abnormally large. Dr. Johnson testified that the size of the tissue sample indicated that the tissue was not deposited from casual contact because clumps of tissue are generally not found under an individual’s fingernails during casual contact. The postconviction court found counsel to be ineffective for his various failings with respect to the fingernail evidence, stating that, “undoubtedly, a jury hearing of an unknown male, not any of the expected males or the defendant, leaving a clump of tissue [] under [Ro-mines’] fingernails undermines confidence in the outcome.”
Strickland Analysis of Fingernail Evidence
Deficiency
Counsel’s testimony indicates that he believed the presence of DNA from an unknown male contributor under Romines’ fingernails was critical to Fitzpatrick’s claim of innocence. It was objectively unreasonable for counsel not to realize he had confused the fingernail evidence from the SAVE kit with the evidence tested by Ragsdale from the autopsy until after the crime scene technician had been presented at trial and released. In counsel’s view this was a critical issue, yet he failed to take the elementary steps to properly authenticate the fingernail evidence from the autopsy to present Ragsdale’s testimony and this evidence.
Further, counsel’s admission during trial that he confused the fingernail evidence between the SAVE kit and the medical examiner’s autopsy establishes that counsel’s actions both before and during trial — -not his intentions — were not strategic. Even if we were to presume that counsel made a strategic decision to introduce the DNA evidence from the autopsy, his careless actions and lack of proper preparation thwarted his ability to accomplish this intent. While we give great deference to counsel’s performance, a trial strategy cannot be considered reasonable unless it is executed properly. Thus, we conclude that these failures which prevented counsel from presenting the DNA results from the fingernail evidence recovered during the autopsy were not “strategic choices made after thorough investigation of law and facts.” Strickland, 466 U.S. at 690, 104 S.Ct. 2052. Accordingly, we hold that counsel was deficient for failing to understand what evidence he wished to admit and to pursue the proper course of action to admit the *769 fingernail evidence that he intended to use in Fitzpatrick’s defense.
While we conclude counsel was deficient for his inability to take the proper steps necessary to introduce this evidence, we nonetheless conclude that he was not deficient for choosing not to retest the fingernail evidence using the STR testing method. Postconviction testimony established that two years before trial, FDLE switched from the DQ alpha testing method to the more discriminating STR method. Counsel never contacted FDLE to retest the fingernail evidence, even though the initial results could not exclude Fitzpatrick or Kirk as contributors of the mixed DNA profile.
Counsel’s trial strategy and post-conviction testimony indicate that he did not retest the fingernail clippings because he was satisfied with the results from the DQ alpha testing. He felt the evidence evincing an unknown contributor to the DNA under Romines’ fingernails was a “hook” of exculpatory evidence that he could present to the jury. In hindsight, retesting the evidence using the STR method would have been beneficial to the defense’s contention that the tissue found under Romines’ fingernails was from an unknown contributor as it was a more discriminating test to exclude known DNA profiles. However, we must make every effort “to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time.” Strickland, 466 U.S. at 689, 104 S.Ct. 2052.
We recognize that a more discriminatory STR test just as easily could have identified Fitzpatrick as the source of the unknown DNA. While the DQ alpha testing did not exclude Fitzpatrick as the source of the DNA, the results benefitted Fitzpatrick because Kirk was not excluded and a third unknown contributor was identified. Counsel’s decision to rely on the results from the DQ alpha testing under the circumstances as they existed before trial can be attributed to reasonable trial strategy. Therefore, we hold that he was not deficient for failing to retest the fingernail evidence found under Romines’ fingernails using the STR method.
To be clear, we find deficiency with respect to counsel’s failure to properly implement his decision to introduce the DNA results from Ragsdale’s testing. However, we conclude that counsel was not deficient when he made a reasonable decision not to retest the fingernail evidence using STR testing. Therefore, our concern with respect to prejudice is whether counsel’s failure to take the necessary steps to introduce Ragsdale’s testimony and the DNA results from the scrapings taken from Ro-mines’ hand during the autopsy undermines our confidence in the outcome of Fitzpatrick’s trial.
Prejudice
This Court on direct appeal listed five reasons why the trial court’s decision to exclude the fingernail evidence was harmless: (1) Fitzpatrick could not establish that the evidence was material because an expert could not accurately determine how long the DNA had been under Ro-mines’ fingernails; (2) the DNA testing results could not exclude Fitzpatrick as a possible contributor; (3) the tissue from the unknown contributor could be explained through the trial testimony of Mercer, who testified that when he was with Romines at the scene she squeezed his arm and her fingernails dug into his flesh; (4) the DNA obtained from Romines’ vagina was consistent with that of Fitzpatrick; and (5) trial counsel stressed to the jury the possibility that the perpetrator was someone other than Fitzpatrick. Fitz *770 patrick, 900 So.2d at 521. Postconviction STR testing and testimony offered during the evidentiary hearing eliminates only the second and third justifications. Postcon-viction testing eliminated Fitzpatrick, Mercer, Romines, and Kirk as possible contributors to the DNA profile on Romines’ right hand. Further, postconviction testimony established that a full single-source DNA profile of an unknown male contributor had been discovered from a large chunk of tissue under Romines’ fingernails that was likely not deposited by casual contact. Despite this testimony, no expert could determine when the tissue was deposited under Romines’ fingernails. In fact, Dr. Johnson testified that no DNA testing method could determine when the tissue was deposited.
This evidence does not sufficiently undermine confidence in Fitzpatrick’s guilt. As this Court noted on direct appeal, the proffered testimony lacks materiality because no expert or method of testing can accurately determine how long the tissue had been under Romines’ fingernails. Consequently, the existence of DNA under Romines’ fingernails is not directly exculpatory for Fitzpatrick, nor does it incriminate the unknown contributor. In light of the testimony of the State’s experts McMahan and Hall, which provided damning, albeit incorrect and misleading, evidence of Fitzpatrick’s guilt, and other evidence that was presented during trial linking Fitzpatrick to the crime, we conclude that the introduction of this evidence on its own does not undermine confidence in the jury’s verdict. Thus, we conclude that counsel did not provide ineffective assistance as to this claim.
Conclusion
Fitzpatrick’s trial counsel provided constitutionally deficient representation. Accordingly, we affirm the postconviction court’s finding of ineffectiveness during the guilt phase because counsel failed to: (1) hire or meaningfully consult with an expert that could have testified during trial or assisted him in rebutting the State’s timeline of events; (2) hire or meaningfully consult with an expert that could have testified during trial or assisted him with respect to the presence of semen on Ro-mines’ underwear; (3) fully investigate and adequately prepare himself to challenge the testimony of the State’s expert witnesses; and (4) challenge the qualifications or rebut the testimony of Rita Hall. We also affirm the postconviction court’s ruling that Fitzpatrick is entitled to a new trial. Because we have granted Fitzpatrick a new trial on his guilt phase claims, we decline to address his penalty phase claims.
It is so ordered.
POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.

. Fitzpatrick presented multiple issues on direct appeal alleging that the trial court erred by: (1) denying his motion for judgment of acquittal on the issue of identity; (2) denying his motion for judgment of acquittal on the issue of sufficiency of the evidence to prove premeditation or that the killing occurred during a sexual battery; (3) denying his motions to suppress statements he made to detectives; (4) denying his motion to suppress DNA results obtained from his blood sample; (5) permitting the State to introduce testimony regarding statements that Romines made at the hospital; (6) not granting a mistrial when Detective Bousquet testified that during the initial interview he mentioned that he thought he needed an attorney; (7) denying his motions to suppress Howard’s and Yar-borough's identifications of him; (8) excluding critical evidence, thereby depriving him of a fair trial; and (9) committing errors that rendered his sentence of death unreliable. He also asserted that Florida’s death penalty statute is unconstitutional and that the trial court erred in sentencing him on the noncapi-tal count of sexual battery without the benefit of a sentencing guidelines scoresheet. Fitzpatrick, 900 So.2d at 506 n. 4.

. The postconviction court resentenced Fitzpatrick to 14 years' incarceration on August 31, 2005.

. Huff v. State, 622 So.2d 982 (Fla.1993).

. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

. BODE Laboratories conducted testing on several pieces of forensic evidence during the postconviction proceedings.

. At the outset we note that with respect to each claim we analyze, the postconviction court explicitly found the credentials of Fitzpatrick's postconviction experts to be "impeccable,” and gave each great weight. The court noted that each of Fitzpatrick’s experts was either an M.D. or Ph.D. They were well qualified by education, and were extensively experienced in the fields in which they testified. Their credentials included being college and law school faculty, recipients of grants in their fields of expertise, lecturers and published authors. In contrast, the postconviction court found that the State’s postconviction witnesses possessed significantly lesser credentials, degrees, and experience within specific fields of science, and that their postcon-viction testimony was often inconsistent with their own trial testimony or the testimony of other trial witnesses for the State. Consequently, the postconviction court concluded, ”[t]o the extent that [the State’s postconviction witnesses’] testimony was inconsistent with the experts presented by the defense during the 3.851 evidentiary hearing, the court relied upon the defense witnesses for the reasons stated above and reflected in the extensive examination of the witnesses in the record.”

. During trial on cross-examination, McMa-han testified that the anal swab did not contain semen.

. The prosecutor later asked Hall if there was any evidence that Romines was using a tampon at the time she was found. Hall responded, “No. And I wouldn’t expect that it had been. Because if a tampon would have been placed in [Romines’ vagina], it would have absorbed all the fluid. And there was a lot of fluid. So she couldn’t have had a tampon in there within a short period of time, like about an hour or so.... And also, I put the speculum in the vagina, the canal itself would have been very dry, and it wasn’t. It was very moist, very full of fluid." (Emphasis supplied.)

. Dr. Williamson testified that microscopic sperm searches have been commonly used for years and that the blood on the underwear did not affect BODE's method of examination.

. Ragsdale testified during the evidentiary hearing that before trial she took small cuttings from the crotch and waist of Romines' underwear to perform differential and DNA extractions as well as DQ alpha polymarker testing. Ragsdale's testing revealed a mixture of DNA from the waist of the underwear and inconclusive results from the crotch area. Dr. Johnson testified that the samples taken by Ragsdale were one or two thread micro-samples removed to do presumptive testing, which was different than taking a larger piece for DNA testing as BODE did during its testing of the underwear.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. In its order granting Fitzpatrick a new trial, the postconviction court heavily criticized counsel's "embarrassingly scant” recollection of Fitzpatrick’s trial, noting that counsel testified in a postconviction capital case without reviewing how many capital cases he had done. Counsel could not testify definitively as to how many capital cases he tried to a first-degree murder conviction where death was on the table. He had virtually no notes for this case, a case in which he was the attorney of record for more than four years. The postconviction court further noted that counsel’s recollection varied as he narrated his answers and literally talked himself into answers. His recollection of faxes and phone calls was vague and hazy.

. Counsel also justified his failure to pursue the retesting of forensic evidence by citing an alleged policy adopted by Pasco County judges at the time of Fitzpatrick’s trial:
[T]he position of the judges was, if you got a court-appointed expert to do physical testing to have something tested to determine if the DNA is right, retest it, those results were not confidential. The only confidential expert you got in Pasco County was a psychiatrist or a psychologist. If you were going to have physical testing done, if the results came back implicating your client, I couldn't bury it.
*756 Based on this alleged policy, counsel testified that he did not seek testing for any forensic evidence. However, the existence of a lack of confidentiality policy — a policy that counsel cannot demonstrate definitively existed — does not automatically render counsel's blanket decision not to retain a forensic expert or retest critical pieces of forensic evidence a reasonable trial strategy. If counsel felt that the lack of confidentiality policy substantially impaired his ability to prepare a defense for Fitzpatrick, he could have challenged the policy, petitioned the trial court for a confidential expert, or hired a nontestifying expert to help him prepare for trial. However, the trial record and counsel’s testimony reflects that he engaged in no such effort.

. Although we conclude that counsel was deficient for failing to conduct a meaningful investigation into the State's forensic evidence, we do not hold that it is always unreasonable for an attorney not to retest forensic evidence, nor do we create a bright line rule that trial counsel must always retain a forensic expert. Certainly, it may be reasonable for counsel not to retest evidence for fear that it will be harmful for the defendant. If counsel had conducted a thorough investigation into the potential benefits and risks associated with retesting Romines' underwear, and then made a tactical decision not to retest Ro-mines' underwear, our holding with respect to this issue may have been different. However, what is clear from the record is that over the course of four years counsel operated on assumptions and impressions, while conducting virtually no meaningful investigation into the most critical pieces of physical evidence that allegedly support Fitzpatrick’s guilt. We cannot accept counsel's conduct as based upon reasonable professional judgment, nor can we say that his performance ensured the “proper functioning of the adversarial process” that the state and federal constitutions require. Strickland, 466 U.S, at 686, 104 S.Ct. 2052.

. The prosecutor made other similar statements during closing argument. Specifically, the State argued "the sperm is still alive at eight o'clock in the morning of the 18th. If Michael Fitzpatrick had said, 'Yeah, I saw her. We had sex at five o’clock in the afternoon,’ we would be in the ballpark.... But according to the testimony of Dr. McMahan, that's not possible ... it didn't happen."

. In addition to rebutting McMahan’s testimony that there was no semen in Romines' underwear, the discovery of Fitzpatrick’s semen would have provided a rebuttal to Detective Bousquet's testimony that "... if [Fitz-Patrick] had sex with her in the morning and semen was leaking out of her that evening when she was found, there would be some type of fluid in her panties; however, none was found. He could not give me a reason.”

. During the evidentiary hearing, the State attempted to corroborate Hall’s classification of the injury as a bite mark through the report of Dr. Breen, a medical doctor, who also classified the injury as a bite mark. Dr. Spitz explained that although Dr. Breen commented that the wounds on Romines were bite marks, he never explained where the wounds were located on Romines' body or the characteristics of those wounds that allow him to make that determination.

. Specifically, counsel told the court during trial that:
I have to be candid with the Court. At that time myself — [the prosecutor] — everybody else was under the impression the fingernail scrapings came from the SAVE kit. Everybody believed that. The record is clear on that. [The prosecutor] believed that. Although I obviously asked [Crime Scene Technician] Joseph myself about fingernail scrapings, I was told it was not in his testimony from the Medical Examiner's Office, I wouldn't have bothered to put that testimony on, because everybody believed the fingernail scrapings were in the SAVE kit. As I told— when I went back out and talked to Ms. Ragsdale, I asked what I needed to give her, and she told me. I realized something was wrong.