# Supreme Court of Florida

_____

No. SC14-878
_____

**WILLIE JAMES HODGES,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[March 16, 2017]

PER CURIAM.

Willie James Hodges appeals an order denying his motion to vacate a judgment of conviction of first-degree murder and a sentence of death under Florida Rule of Criminal Procedure 3.851. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm the postconviction court's order as to Hodges's conviction but vacate the death sentence and remand for a new penalty phase.

## I. BACKGROUND

Hodges was convicted of first-degree murder and sentenced to death. On appeal, we affirmed the conviction and the death sentence. Hodges v. State, 55 So.

3d 515, 519 (Fla. 2010).  The evidence showed that the victim was bludgeoned and stabbed in her home.  Id.  Her relatives came to the home while the intruder was still inside.  Id.  The relatives heard window glass breaking, and one of them saw the intruder run away and scale a fence into a neighbor's yard.  Id.  A claw hammer and a braided brown leather belt were found by the body.  Id. at 520.  The victim's purse was missing.  Id. at 519.  Some photographs and a knife with a black plastic handle were found on the ground outside the broken window.  Id. at 520.  The hammer and the knife were the probable murder weapons.  Id.  Police used a canine to track the suspect's path of escape.  Id. at 519.  Along the path they found a jacket, two shoes, and two white socks.  Id.  The victim's daughter testified that the jacket looked like the one she had seen on the fleeing intruder.  Id. at 520.  A witness who was married to Hodges's niece testified that he had previously seen Hodges wearing the jacket and shoes that were admitted into evidence.  Id.  Another witness testified that Hodges owned a braided leather belt and carried a knife with a black handle and identified the items in evidence as similar.  Id.  Another witness testified that some of the photographs found outside the victim's window were photographs that she had mailed to Hodges, and she identified her handwriting on the back of one of the photos.  Id.  The parties also stipulated that Hodges's writing was on another one of the photos, and Hodges's fingerprints were on two of the photos.  Id.

A DNA profile developed from blood on one of the socks was compared to Hodges's DNA profile and was found to match on all thirteen available markers, with a random match probability of one in 990 quadrillion. Id at 521. Analysis conducted on mitochondrial DNA collected from a hair found on the victim's clothing and a hair found on the jacket did not exclude Hodges as the donor but would exclude 99.88 percent of randomly selected individuals. Id. Male DNA detected in material from an anal swab of the victim matched Hodges's DNA profile on the six available markers and would exclude 96 percent of the male population. Id. Material from the other sock yielded two separate partial DNA profiles that were consistent with Hodges's DNA but would exclude 99.92 and 99.9 percent of the male population, respectively, and all of the female population. Id. There was also testimony that Hodges admitted his guilt to a cellmate and to the daughter of a woman he had dated. Id. at 522.

Evidence of a collateral murder was admitted under the Williams[1] rule. Id. at 521. The evidence included DNA from sperm cells detected on a vaginal swab, which matched Hodges's DNA profile on five markers. Id. A separate sample of epithelial cells from the swab matched his profile on seven markers. Id. at 521-22. There was also evidence that a bruise on the body of the victim of the collateral

---

1. See Williams v. State, 110 So. 2d 654 (Fla. 1959).

murder was probably a bite mark, and a forensic dentist testified that the mark was consistent with Hodges's teeth.  Id. at 522.

The jury recommended a sentence of death by a vote of ten to two.  Id. at 525.  The trial court found five aggravating circumstances were proven beyond a reasonable doubt: (1) the defendant was under sentence of imprisonment at the time of the murder; (2) the defendant had previously been convicted of a felony involving violence; (3) the murder was committed while the defendant was engaged in the commission of or an attempt to commit sexual battery; (4) the murder was committed for pecuniary gain; and (5) the murder was especially heinous, atrocious, or cruel.  Id. at 542.  The court found the following statutory mitigating circumstances: (1) at the time of the murder the defendant was under the influence of an extreme mental or emotional disturbance; (2) the capacity of the defendant to conform his conduct to the requirements of the law was substantially impaired; and (3) the age of the defendant at the time of the crime.  Id.  The court also found numerous nonstatutory mitigating circumstances having to do with Hodges's low intelligence, difficult upbringing and background, mental and emotional problems, and similar or related matters.  Id.

In his direct appeal to this Court, Hodges argued: (1) that the trial court should have allowed the jury to determine the issue of mental retardation; (2) that the trial court erred in finding he was not mentally retarded; (3) that the trial court

- 4 -

erred in ruling that the State could discuss the collateral crime evidence in its rebuttal argument; (4) that the trial court allowed the collateral crime evidence to become a feature of the trial; (5) that the trial court erred in refusing to allow Hodges to waive a penalty-phase jury; and (6) that the death sentence was impermissible under Ring v. Arizona, 536 U.S. 584 (2002). Id. at 526. We rejected all of Hodges's arguments, concluded that the evidence was sufficient to support the verdict and the death sentence was proportionate, and we affirmed the conviction and sentence. Hodges filed a petition for certiorari in the United States Supreme Court, which was denied. Hodges v. Florida, 565 U.S. 846 (2011).

In his motion for postconviction relief, Hodges raised the following claims: (1) trial counsel was ineffective in failing to retain a DNA and statistics expert to help counsel challenge the admissibility of the State's DNA and statistics evidence and cross-examine the State's experts; (2) counsel was ineffective in cross-examining the State's scientific experts regarding their statistical calculations and in failing to present expert testimony to rebut the State's scientific evidence; (3) counsel was ineffective in failing to consult an expert and to object to testimony about DNA from the body of the collateral crime victim on the ground that the testing and analysis did not comply with applicable standards for accuracy and reliability; (4) counsel was ineffective in failing to present the testimony of Hodges, who would have testified that the personal belongings linking him to the

crime scene were stolen from him prior to the murder; (5) counsel was ineffective in failing to cross-examine the State's witnesses who identified the jacket and shoes linking Hodges to the crime scene on their inability to identify the items as the specific items they had seen before; (6) counsel was ineffective in failing to obtain telephone service records to impeach the testimony of a witness who testified that Hodges confessed to her in a telephone conversation; (7) counsel was ineffective in calling a witness whose testimony had the effect of identifying Hodges as the likely perpetrator; (8) counsel was ineffective in failing to rebut the testimony of a forensic dentist who testified about the identification of Hodges from the bite-mark evidence in the collateral crime case; (9) counsel was ineffective in cross-examining a crime scene investigator because the questioning brought out improper and unfavorable opinion testimony about possible or likely events relative to the murder; (10) counsel was ineffective in advising Hodges regarding the impeachment he would face if he testified; (11) counsel was ineffective in failing to object to the trial court's failure to state reasons for denying Hodges's request to waive a penalty-phase jury; and (12) Florida's death penalty statute is unconstitutional.

The trial court held evidentiary hearings on claims 1 through 10, Hodges abandoned claim 11, and the trial court denied claim 12. As to the remaining claims of ineffective assistance of counsel, the trial court ruled that Hodges failed

to establish that counsel's performance was deficient and even if it was, there is no reasonable probability that but for counsel's deficiency, the result of the proceeding would have been different.

## II. ANALYSIS

On appeal from the denial of his motion for postconviction relief, Hodges raises the following claims: (1) trial counsel was ineffective in failing to consult experts to assist him to prepare to challenge the State's DNA and bite-mark evidence, cross-examine the State's experts, and present evidence to rebut the State's scientific evidence; (2) trial counsel rendered ineffective assistance by failing to present Hodges as a witness at trial; (3) trial counsel provided ineffective assistance by calling a witness who gave testimony that incriminated Hodges; (4) trial counsel rendered ineffective assistance in failing to obtain telephone records to impeach the testimony of a witness who testified that Hodges confessed his guilt in a telephone conversation; (5) trial counsel was ineffective in failing to cross-examine witnesses who identified articles of clothing linked to Hodges; and (6) trial counsel was ineffective in cross-examining a crime scene technician in a way that brought out testimony that was harmful to the defense.

A defendant challenging a conviction on the ground of ineffective assistance of counsel has the burden of showing that counsel was deficient and that the deficiency prejudiced the defense. See Strickland v. Washington, 466 U.S. 668,

687 (1984); Bolin v. State, 41 So. 3d 151, 155 (Fla. 2010).  To establish deficiency, the claimant must show a specific act or omission that falls below an objective standard of reasonableness under prevailing professional norms.  See Foster v. State, 132 So. 3d 40, 52 (Fla. 2013); Maxwell v. Wainwright, 490 So. 2d 927, 932 (Fla. 1986).  To establish prejudice under Strickland, "the defendant must demonstrate that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " Hoskins v. State, 75 So. 3d 250, 254 (Fla. 2011) (quoting Strickland, 466 U.S. at 694).  This standard does not require that a defendant show " 'that counsel's deficient conduct more likely than not altered the outcome' of his penalty proceeding, but rather that he establish 'a probability sufficient to undermine confidence in [that] outcome.' " Porter v. McCollum, 558 U.S. 30, 44 (2009) (alteration in original) (quoting Strickland, 466 U.S. at 693-94).

"Because both prongs of the Strickland test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the trial court's factual findings that are supported by competent, substantial evidence, but reviewing the trial court's legal conclusions de novo." Pagan v. State, 29 So. 3d 938, 949 (Fla. 2009); see also Johnston v. State, 63 So. 3d 730, 737 (Fla. 2011); Sochor v. State, 883 So. 2d 766, 771-72 (Fla. 2004).  "[W]hen a defendant fails to make a showing as to one prong, it is not necessary to delve into whether he has

made a showing as to the other prong." Mungin v. State, 932 So. 2d 986, 996 (Fla. 2006) (alteration in original) (quoting Waterhouse v. State, 792 So. 2d 1176, 1182 (Fla. 2001)).

"There is a strong presumption that trial counsel's performance was not ineffective." Pagan, 29 So. 3d at 949. "A fair assessment of attorney performance requires" that courts "evaluate the conduct from counsel's perspective at the time" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689.

**Claim 1**

Hodges asserts that trial counsel was ineffective in failing to consult experts and present expert testimony regarding the State's scientific evidence of DNA and bite-mark analysis. He argues that such experts could have helped him to prepare to challenge the State's evidence, cross-examine the State's experts, and develop and present rebuttal evidence and argument.

At the evidentiary hearing, Hodges presented the testimony of Dr. Kevin Noppinger, an expert in DNA analysis. Dr. Noppinger testified that in their analyses, the State's experts arrived at random match probabilities using the "inclusion principle," but at trial, Dr. Martin Tracey, a population geneticist testifying as an expert witness for the State, improperly relied upon the "exclusion principle" in his random match probability testimony. The "inclusion principle"

expresses the probability of a random match in positive or inclusionary terms, while the "exclusion principle" gives the probability of excluding the random match. Dr. Noppinger testified that under prevailing scientific standards, expressing the random match probability statistics using the exclusion principle is not scientifically accepted and the inclusion principle is the preferred method of presenting match probability statistics. In Dr. Noppinger's opinion, expressing random match probability statistics using the exclusion principle can be misleading because it can make the probability of a random match seem smaller than it actually is. Hodges argues that trial counsel's failure to object or cross-examine Dr. Tracey when he testified about random match probabilities using the exclusion principle can be attributed to counsel's failure to retain a DNA expert to help him prepare for trial. Dr. Noppinger also testified that the other DNA testimony presented at trial did not conform to the applicable standards and on this basis, Hodges argues that counsel should have used available scientific expertise to challenge the accuracy and reliability of the State's testing, lab reports, and expert testimony.

There are two components of DNA analysis and both must be provided to the trier of fact in order for DNA evidence to have probative value: (1) an examination of the biological material in evidence in comparison with a known DNA sample; and (2) statistical analysis to determine the probability of matching

the tested material to random individuals in the general population or specified subgroups. "The first step uses principles of molecular biology and chemistry to determine that two DNA samples look alike. The second step uses statistics to estimate the frequency of the profile in the population." Butler v. State, 842 So. 2d 817, 827 (Fla. 2003); see also Brim v. State, 695 So. 2d 268, 271 (Fla. 1997) ("It is important to recognize, though, that DNA testing is a two-step process. The fact that a match is found in the first step of the DNA testing process may be 'meaningless' without qualitative or quantitative estimates demonstrating the significance of the match."). Hodges contends that the State's expert witnesses testified that their analyses discovered "matches" with Hodges's DNA without providing the necessary random match probability statistics and that trial counsel failed to object because he had not consulted his own DNA expert and therefore had not informed himself about the applicable standards for presenting DNA evidence. However, at Hodges's trial, the State chose to have its laboratory analysts present the biological features of their test results first and then present Dr. Tracey to testify as to the statistical analyses applicable to all the DNA testing. All the DNA tests presented at trial were accompanied by statistical analyses provided separately by Dr. Tracey.[2]

2. The only exception was the DNA test of the swab from the bite mark on the victim of the collateral murder. The expert only found one marker, which did not exclude Hodges, but the analyst considered the finding to be of little

In the order denying postconviction relief, the trial court discussed Dr. Noppinger's criticisms of the State's scientific experts who testified at trial. The court found that State expert Melton, who performed the mitochondrial DNA analysis on the cuttings from one of the socks as well as the hairs from the jacket and the victim's jeans, had statistical calculations on some but not all of the tested samples in her written report but did not testify about statistics. Melton testified that the mixed DNA sample obtained from the sock was difficult to analyze and she could say only that Hodges could not be excluded as the source. Dr. Noppinger acknowledged that Melton had valid statistical calculations in her report for the samples derived from the hairs.

State expert Hatler performed DNA analysis on other sock cuttings. Based on three markers from the top of the sock and four markers from the heel and toe, she developed partial profiles that were consistent with Hodges's DNA. Dr. Noppinger found fault with the fact that Hatler provided no statistical calculations in her testimony, but he conceded that her written report included the calculations.

---

significance and therefore did not include the test result in her written report, and the testing was apparently not reviewed by another analyst in accordance with standard procedures. However, as we discuss below, there is no reasonable probability that an objection by trial counsel on this basis would have made a difference to the outcome.

State expert Johnson performed DNA testing on the anal swab from the body of the victim of the instant murder, the vaginal swab from the victim of the collateral murder, and the swab from the bite mark on the collateral murder victim. Dr. Noppinger said that Johnson's testing of the bite-mark swab was not properly reported in writing and was not reviewed by a second analyst as required by national standards. The trial court found that the anal swab sample was analyzed on six markers, all of which matched Hodges. As for the vaginal swab from the collateral crime victim, the sperm fraction matched Hodges on five markers and the epithelial cells on seven markers. Johnson's written report included frequency calculations for these test results.

State expert Zuleger tested the blood found on one of the socks and developed a profile consisting of thirteen markers, all of which matched Hodges.

Dr. Noppinger did not say there were any errors, fallacies, or miscalculations in any of the experts' laboratory testing or statistical calculations. As the trial court found, Dr. Noppinger could not say that the experts' descriptions of their results as "matching" Hodges was improper. The analysts who conducted the laboratory tests did not testify about their frequency calculations—even though they included such calculations in their written reports for some of their tests—because the State chose to have all of the probability statistics presented by its statistical expert, Dr. Tracey.

- 13 -

Dr. Noppinger found fault with Dr. Tracey's testimony because Dr. Tracey expressed the statistical calculations in terms of exclusion rather than inclusion, which, in Dr. Noppinger's view, can be misleading. However, Dr. Noppinger conceded that neither method is more accurate than the other. Hodges has not directed us to any authority that directly supports the argument that testimony such as Dr. Tracey's is considered misleading according to a consensus of scientific opinion.

Even though the State's DNA analysts did not initially testify about random match probability statistics, trial counsel cross-examined them based on the statistics in their written reports. And although Dr. Tracey testified in terms of exclusion on direct examination, he acknowledged several of the random match probabilities in inclusive terms on cross-examination.

At the evidentiary hearing, trial counsel admitted that his understanding of DNA evidence principles was crude. Nevertheless, the trial court found that the DNA evidence did not go unchallenged and that counsel's performance was not deficient.

Hodges presented Dr. Daniel Spitz, a forensic pathologist, to testify at the evidentiary hearing regarding the bite mark. Dr. Spitz testified that the bite-mark identification evidence presented at trial did not provide a definitive match to Hodges and that bite-mark identification evidence in general is regarded as highly

questionable by the scientific community. On this basis, Hodges argues that trial counsel should have retained a bite-mark expert, learned about the current status of bite-mark evidence, and been prepared to challenge the admissibility and reliability of the bite-mark evidence. The trial court found that while trial counsel did not challenge the admissibility of the bite-mark identification testimony, he did not allow the testimony to go unchallenged. On cross-examination, trial counsel brought out that the witness had prepared no written report, that the number of marks available for comparison was limited, and that diffusion had affected all the points of comparison. The trial court found that trial counsel's performance was not deficient because at the time of the trial, bite-mark identification evidence was considered admissible, see, e.g., Mitchell v. State, 527 So. 2d 179, 181 (Fla. 1988), and that even if the law has changed based on current scientific opinion, an attorney's performance cannot be found deficient for failing to anticipate a change in the law. Walton v. State, 847 So. 2d 438, 445 (Fla. 2003).

As authority for his claim that trial counsel was deficient in failing to consult experts to challenge the State's DNA evidence, Hodges cites State v. Fitzpatrick, 118 So. 3d 737 (Fla. 2013). In Fitzpatrick, trial counsel failed to prepare any challenge to the State's scientific evidence as to the timing of sexual activity in relation to the time of the victim's death, which allowed the State to present an unsound but unrebutted theory of the defendant's guilt of murder. The present

- 15 -

case is different because if counsel had raised the kinds of challenges Hodges claims he should have raised, it would not have undermined the State's case to any significant extent. Counsel admitted that his understanding of DNA evidence was rudimentary, but based on his experience in criminal trials, he thought there was little to be gained by challenging the DNA evidence. He made a strategic decision based on consideration of alternative courses of action. See, e.g., Crain v. State, 78 So. 3d 1025, 1037 (Fla. 2011). Where consulting an expert "would not have changed the statistical numbers in any way," trial counsel's tactic of bringing out the limitations of the expert testimony through cross-examination is reasonably effective representation. Reed v. State, 875 So. 2d 415, 425 (Fla. 2004).

The trial court found that while trial counsel could have done more to challenge the DNA evidence, in light of the defense strategy to concede that the tested items belonged to Hodges, trial counsel's actions were reasonable. Where the defense strategy is such that identification by DNA evidence is not of central importance, a trial court's conclusion that such a tactical decision by counsel was not deficient performance has been upheld. See McDonald v. State, 952 So. 2d 484, 495 (Fla. 2006).

The DNA from the swab of the bite mark did not play a significant role in the trial. The analyst testified that she was able to extract only one marker, which was of extremely limited use in comparison to the known sample. The witness

said only that Hodges could not be excluded as the contributor. Thus, there is no reasonable probability that trial counsel's failure to cross-examine the witness on the lack of probability statistics or the lack of peer review in the laboratory testing process affected the outcome of the trial. Even if trial counsel could have done more to challenge the testimony concerning DNA testing on the swab from the site of the bite mark on the collateral crime victim, we affirm the denial of relief on this point because Hodges failed to establish that he was prejudiced by any deficiency.

The DNA profile from blood found on a sock recovered from the perpetrator's path of escape from the victim's home matched Hodges's DNA, and the statistical frequency of the profile was one in 990 quadrillion. The DNA testing on the anal swab matched Hodges's profile to the exclusion of 96 percent of the male population. As the trial court found, the DNA evidence and statistics presented at trial did not go unchallenged. However, because Hodges told his lawyer that his clothes and other personal items had been in a suitcase that was stolen weeks before the murder, counsel did not focus on the DNA evidence but planned a defense that would account for Hodges's DNA being on the items. Hodges's own expert, testifying at the evidentiary hearing, conceded that all of the State's statistical data was sound. Therefore, Hodges has failed to show that there is any reasonable probability that more thorough preparation on trial counsel's

part, with a view to challenging Dr. Tracey's testimony or cross-examining him on his calculations, would have affected the outcome.

The trial court found that trial counsel did cross-examine the State's experts about their DNA findings, bringing out admissions that other than the blood on one of the socks, the other tests, including mitochondrial DNA analysis of hairs from the jacket and the victim's clothing, merely concluded that Hodges could not be excluded as the contributor of the sample and that the probabilities of matching persons other than Hodges were not infinitesimally small as the probability was with the blood on the sock.

When a defense attorney does not have a strong understanding of the science of DNA evidence, effective representation in a criminal case may call for consultation with experts. However, to prevail on a claim of ineffective assistance of counsel, in addition to showing a deficiency in performance falling below an objective standard of reasonableness, the defendant has the burden of showing that absent the deficiency, there is a reasonable probability that the outcome would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Strickland, 466 U.S. at 694. "In making this determination, a court . . . must consider the totality of the evidence before the judge or jury." Downs v. State, 453 So. 2d 1102, 1108 (Fla. 1984) (quoting Strickland, 466 U.S. at 695).

One of the socks found on the path tracked by the scent-tracking canine had blood on it. DNA extracted from the blood matched Hodges's DNA on all thirteen markers. The probability of the DNA profile matching a randomly selected individual was inconceivably small. Two DNA samples found on the other sock also matched Hodges, with the probability of a random match being no more than one tenth of one percent. DNA from the hairs collected at or near the crime scene matched Hodges with a random match probability of slightly over one tenth of one percent. Material from the anal swab matched Hodges and excluded 96 percent of the male population. Photos that belonged to Hodges were found at the scene. Two witnesses testified that Hodges told them he committed the crime. In light of the totality of the evidence, we affirm the trial court's denial of relief on the ground that there is no reasonable probability that more thorough preparation by trial counsel through consultation with experts would have made any difference to the outcome of the trial.

**Claim 2**

Hodges argues that trial counsel was deficient in failing to present Hodges as a witness for the defense because the defense strategy depended on his testimony. Hodges asserts that the defense strategy, as revealed in counsel's opening statement, was based on the claim that the jacket, shoes, and photographs found at or near the crime scene were stolen from him weeks before the murder, supporting

the inference that whoever stole the items left them at the crime scene and was the probable perpetrator. In his opening statement, trial counsel told the jury that the evidence would show that these items were stolen from Hodges weeks before the murder. However, the defense did not present any evidence to support that assertion. Hodges argues that after the jury was told in the opening statement that the evidence would show the items had been stolen, trial counsel's failure to put Hodges on the witness stand was an abandonment of the only defense strategy, which left Hodges with no viable defense.

At the evidentiary hearing, Hodges stated that if he had been called to testify at trial, he would have stated that the jacket, shoes, and photographs had been in a suitcase that was stolen shortly before the murder. Hodges also would have testified that while working on a car at his cousin's house, which was next door to the victim's house, he cut his hand and wiped off the blood on a cloth that he left there, which he claims would have explained how a sock with his blood on it had come to be found in the area of the murder.

Hodges argues that his testimony would have created sufficient doubt that the outcome might have been different. He also said he would have denied making the incriminating statements testified to by his ex-girlfriend's daughter and would have told the jury there was no telephone at the house where the ex-girlfriend and

her daughter lived at the time when the daughter claimed the telephone conversation had taken place.

Hodges claims that he decided not to testify in his own defense at trial because of faulty legal advice given to him by trial counsel. Hodges claimed at the evidentiary hearing that trial counsel advised him that if he testified at trial, the prosecutor would be allowed on cross-examination to question him about everything in his past, including pending charges. At the time of the trial, there were pending murder charges against Hodges in Ohio and in Alabama. The facts of the Ohio murder were admitted into evidence at trial under the Williams rule.

Trial counsel testified at the evidentiary hearing that he would not have advised Hodges the State could impeach him through questioning about a pending murder charge if he testified. Trial counsel said that he would have advised Hodges that if Hodges testified, the State would be able to ask him if he had ever been convicted of a felony or a misdemeanor involving an element of fraud and, if so, how many times. Counsel would have told Hodges that only if Hodges denied having been convicted would the State be allowed to introduce evidence of his prior convictions. Counsel said he also advised Hodges that since the facts of the Ohio murder had been admitted under the Williams rule, the State could question him about the Ohio murder and his answers might be used against him in Ohio,

since that case was still pending in Ohio. But trial counsel insisted he would not have advised Hodges that he could be questioned about other pending charges.

The trial court found that counsel provided detailed and thorough advice to Hodges about the benefits and risks of testifying in his own defense and that Hodges's decision, made in consultation with his counsel, was given careful consideration. The trial court found that trial counsel was an experienced criminal trial attorney and would not have given legally erroneous advice on such an elementary question of criminal procedure. The trial court found that Hodges made the decision not to testify upon receiving advice of counsel based on all the circumstances, including counsel's concerns about the effect Hodges's testimony might have on the penalty phase.

The trial court found Hodges's testimony on this point incredible and found as a matter of fact that trial counsel did not advise Hodges that if he testified he could be cross-examined about or impeached with information concerning past misconduct or collateral offenses. This finding was based on the trial court's assessment of the credibility of the witnesses. In judging the credibility of witnesses, the trial court has a superior vantage point. See Moore v. State, 132 So. 3d 718, 727 (Fla. 2013). An appellate court does not substitute its judgment for that of the trier of fact when the finding of fact is supported by competent, substantial evidence. See Porter v. State, 788 So. 2d 917, 923 (Fla. 2001). The

trial court's finding of fact on this point is supported by competent, substantial evidence in the record and must be upheld.

Trial counsel testified at the evidentiary hearing that his opening statement was based on what Hodges told him concerning his personal items being stolen, and Hodges's decision not to testify was made later in the trial. Advising a defendant of the scope and possible consequences of impeachment and cross-examination is reasonable representation. See, e.g., Bell v. State, 965 So. 2d 48, 58-59 (Fla. 2007). Making a reasonable strategic choice after considering possible alternative courses of action is not ineffective assistance. Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000). Trial counsel's advice, as the trial court found, was legally correct and was reasonable advice under the circumstances. We conclude that competent, substantial evidence supports the trial court's finding that trial counsel did not give erroneous advice causing Hodges to decide not to testify when it would have been more advantageous to him to testify.

But whether trial counsel was deficient for telling the jury in his opening statement that the evidence would show that Hodges's personal items were stolen prior to the murder, knowing that there would be no such evidence presented if Hodges did not testify, raises a different question. If Hodges had testified that his personal items had been stolen, this might have explained how these personal items could have been found at or near the crime scene without him being involved in the

- 23 -

crime. Hodges also emphasizes that he would have testified that prior to the murder he was working on a car at his cousin's house next door, cut his hand, and wiped blood on a cloth that he left at his cousin's house. The argument is that Hodges's testimony on these matters might have raised a doubt in the minds of the jurors sufficient to have brought about a different outcome at trial.

At the evidentiary hearing, trial counsel testified that when he gave his opening statement, he believed Hodges might testify, although he knew there was a possibility he would not, and he told the jury so. Hodges's decision not to testify was made later in the trial, after the close of the State's evidence. Defense co-counsel testified that, based on the evidence presented by the State and the need to prepare for a likely penalty phase, he did not think Hodges should testify. Trial counsel testified that even without Hodges's testimony, he believed his opening statement was sound trial strategy because it suggested a plausible scenario for the jury to consider that would constitute a basis for doubt about Hodges's guilt. The trial court found that trial counsel did not render ineffective assistance.

We need not determine whether trial counsel's representation as to the matter of the opening statement and Hodges not testifying was deficient if there is no reasonable probability that trial counsel's course of action, even if deficient, prejudiced the defense. See, e.g., Maxwell, 490 So. 2d at 932. The totality of the

evidence before the jury must be considered in making this determination.  See

Downs, 453 So. 2d at 1108.

In light of the DNA evidence obtained from the bloody sock, the other sock,

the hairs collected from the victim's body, the jacket found along the path taken by

the murderer, and the anal swab, as well as the photos left at the crime scene with

Hodges's fingerprints and handwriting on them, the testimony of the two witnesses

that Hodges confessed to the murder, and the fact that witnesses identified the

clothes, knife, and belt as similar to items belonging to or worn by Hodges, we

conclude that no prejudice has been demonstrated.

**Claim 3**

A neighbor of the victim told police that on the day of the murder, he

confronted a trespasser who came over a fence into his yard.  The neighbor's

description was used to create a sketch, which did not look much like Hodges, and

the neighbor failed to select Hodges from a photo lineup.  Trial counsel planned to

call this neighbor as a witness in an attempt to show that the intruder in his yard—

who was also likely the murderer—was not Hodges.

Before presenting the neighbor as a witness, trial counsel went to the

neighbor's home and displayed a group of photos to him.  The neighbor was

unable to identify the photo of Hodges as the man he had seen in his yard.  On the

day the man was to testify at trial, trial counsel, with the court's permission and in

the presence of the prosecutor, had the neighbor look at Hodges in the courtroom, and the neighbor said Hodges resembled the man he had seen in his yard. The State and the defense signed a stipulation to this effect, which was read to the jury.

In his testimony, the neighbor said that Hodges looked like the man he had seen in his yard. Trial counsel then called the neighbor's wife to testify, and she confirmed that the neighbor had been unable to choose Hodges's photo from a lineup. Hodges argues that for trial counsel to present the neighbor as a witness knowing that he might identify Hodges as the man he had seen in his yard, was ineffective assistance because it helped convict Hodges. Hodges argues that trial counsel should have been accompanied by another person when he went to the witness's home so he would have had a third-party witness to testify about what happened. Had he done so, he could have used the third party's testimony to impeach the neighbor by confirming that the neighbor failed to identify Hodges from the group of photos shown to him by trial counsel.

The trial court found that trial counsel was surprised by the neighbor's change of testimony and responded by calling the neighbor's wife to counter the effect of her husband's testimony. The trial court found that calling the neighbor's wife was a reasonable effort at impeachment and the neighbor's wife confirmed that two nights previously her husband had been unable to select Hodges from the group of photos shown to him by trial counsel. The trial court found that trial

counsel did an effective job of addressing the identification testimony in his closing argument to the jury and made reasonable choices as to how to proceed after weighing the risks and benefits of different courses of action, which is reasonable representation under Simmons v. State, 105 So. 3d 475, 487-88 (Fla. 2012). The trial court concluded that counsel's chosen course of action was a reasonable response to the situation and that trial counsel handled the matter as well as possible under the circumstances. The court concluded that there was no substantial deficiency in the representation and that even if counsel had taken any of the actions Hodges now argues were required, there is no reasonable probability that the result would have been different. The trial court's factual findings are supported by competent, substantial evidence and its legal conclusions are correct.

An assessment of an attorney's performance under Strickland requires an effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. The trial court found trial counsel's conduct reasonable under the circumstances, and we affirm the denial of relief on this point.

**Claim 4**

At trial, a witness for the State testified that Hodges confessed to her in a telephone conversation that he committed the murder. The witness knew Hodges

through her mother, who had dated Hodges. The witness testified that she received the telephone call during which Hodges confessed while she was at her mother's house in the "May timeframe" of 2003. At the evidentiary hearing, Hodges denied both the confession and the telephone conversation. He claimed that the residence where the witness claimed to have received the call did not have a telephone. Hodges showed that the telephone service provider had no record of the call. Hodges contends that trial counsel was deficient in failing to obtain telephone service records to impeach the witness's testimony by showing that there was no phone service in her mother's home in May 2003.

There was testimony at the evidentiary hearing that sometimes the witness's mother's home had telephone service and sometimes it did not. This evidence did not show that the call could not have taken place; it merely showed that the phone company had no record of the call having taken place because the records no longer existed. Hodges's argument that had trial counsel investigated, he would have discovered evidence that could have been used to impeach the witness is speculative.

The trial court found that Hodges did not prove that the residence did not have phone service at the time the witness said she received the call from Hodges, only that there are no records of the service in existence now. The trial court concluded that Hodges failed to show that trial counsel's performance was

deficient.  Further, the trial court concluded that even if counsel had been able to show that there was no phone in the home in May 2003, the court could not find that the witness's testimony would have been significantly diminished.  The witness stated only that the call occurred in the "May timeframe," and considering that the trial took place nearly five years after the phone call in question, even if records could have been obtained and used at trial to show that there was no telephone service in the home in May 2003, this would not have proven that the conversation did not take place nor would it have necessarily undermined the witness's credibility.  Because the jury still could have credited the witness's testimony regarding the content of the conversation, the trial court concluded there is no reasonable probability the jury would have been affected by any impeachment trial counsel could have achieved by showing the home had no phone service, especially in light of the fact that another trial witness also offered testimony that Hodges confessed to him that he committed the murder.

The trial court's factual determinations concerning this claim are supported by competent, substantial evidence, and we therefore defer to them.  On de novo review, we hold there is no error in the trial court's legal conclusion that Hodges failed to show deficient performance on this point.  We therefore affirm the denial of postconviction relief on this claim.

**Claim 5**

Hodges claims that trial counsel was ineffective in failing to cross-examine the State witnesses who identified certain items of clothing, referred to by their brand names, as having been worn by the fleeing perpetrator and previously seen in the possession of Hodges. The victim's daughter testified that when she entered her mother's house, she saw through a window someone running away from the house wearing a blue and gray jacket. She identified a jacket that police found outside the house as the jacket she saw the fleeing person wearing. The jacket was described by reference to the designer label, "Members Only." The husband of Hodges's niece testified that the jacket and shoes found near the crime scene and admitted into evidence were the jacket and shoes he had previously seen Hodges wearing. The shoes bore the "Timberland" label.

Hodges argues that effective cross-examination of these witnesses would have forced them to concede that they could not testify with certainty that the items were the same as those previously seen, only that the items in evidence looked like or were similar to the items they had previously seen Hodges wearing. There were no particular identifying marks on the items that would have permitted the witnesses to know that these mass-produced items were the specific items they had seen previously.

As previously mentioned, trial counsel testified at the evidentiary hearing that Hodges told him the personal items found at or near the crime scene had been

in a suitcase that was stolen from him weeks before the murder. Trial counsel planned the defense around this position and therefore did not focus on the issues surrounding the identification of the jacket and shoes.

Hodges's argument is that trial counsel should have cross-examined the witnesses to get them to admit that the most they could say about the jacket and shoes in evidence was that they were the same style, size, color, and possibly brand name as the items the witnesses had seen previously. The trial court observed that counsel certainly could have cross-examined these witnesses with these questions but ultimately concluded that the failure to do so was not deficient representation. The trial court reasoned that jurors are aware that items such as Members Only jackets and Timberland shoes are mass produced by the tens of thousands and that identification testimony such as was received in this case is understood to mean that the items in evidence appeared to be of the same type as the items the witnesses had seen previously.

To be effective it is not necessary for counsel to present evidence explaining facts that are common knowledge. See Reed, 875 So. 2d at 423. Moreover, trial counsel's strategy, based on information given to him by Hodges, was not to contest that the items belonged to Hodges. We agree with the trial court that there was no deficiency and conclude that the trial court did not err in denying relief as to this claim.

## Claim 6

Hodges claims that trial counsel was ineffective in cross-examining a crime scene technician who testified for the State because counsel's questioning elicited testimony that was harmful to the defense. Hodges's position now is that trial counsel should have pursued a defense based on the theory that the sock with the blood on it, which was linked to Hodges by DNA evidence, had either been stolen from him with the blood already on it before the crime or had been used to wipe off blood from a cut Hodges sustained while working on a car at the house next door to the murder scene and was then discarded and left in the area where it was later found.

At trial, trial counsel asked the technician if there were similar socks found in the house, and the witness answered yes. Counsel asked the technician whether she believed the perpetrator covered his hands before entering the home, and she answered no. Counsel asked the technician whether she thought the perpetrator covered his hands with the socks after the murder, and she answered yes. Counsel asked the technician whether the blood could have been deposited on the sock before the murder, and the witness answered that it was possible but unlikely.

Hodges asserts that the crime scene technician lacked the expertise to reconstruct the criminal scenario, but that trial counsel's questioning essentially allowed her to do so. According to Hodges, eliciting this testimony was deficient

representation because it helped the State's case by supporting the theory that the murderer had covered his hands with socks he found in the house and cut himself while breaking a window to exit the house when the victim's relatives came to the front door.

In ruling on the postconviction motion, the trial court discussed trial counsel's cross-examination of the crime scene technician in detail and found that, as a whole, it was thorough and effective. Through cross-examination of the crime scene technician, trial counsel brought out that the blood could have already been on the sock for an indefinite period of time before the murder because there is no way to tell the age of a bloodstain. Counsel also brought out that the bloodstain was small, that there was no evidence to show how it got on the sock, and that it might have no connection whatsoever to the case.

The trial court found that the factual inferences that Hodges faults trial counsel for bringing out were already there for the jury to draw. Trial counsel testified at the evidentiary hearing that some of his questioning was intended to lead the witness to overreach, thereby depicting her as a "hired gun" willing to say anything to help the prosecution. The trial court found that trial counsel's tactics in this regard were not unreasonable. Trial counsel made strategic choices from the available courses of action. The trial court concluded that there was no deficiency and no possible prejudice from trial counsel's course of action.

We affirm the denial of relief on the ground that Hodges has failed to show that there is a reasonable probability that any alleged deficiency in counsel's performance affected the outcome.

**Cumulative Prejudice Analysis**

We have resolved three of Hodges's claims based on a lack of prejudice, without resolving whether counsel's performance was deficient. These three claims are those relating to: (a) the failure to challenge the admissibility of the DNA testing on the swab from the site of the bite mark on the victim of the collateral murder; (b) trial counsel's comment in his opening statement that evidence would show that Hodges's personal effects found at or near the scene of the murder had been previously stolen; and (c) the cross-examination of the crime scene technician regarding the blood on the sock.

Even without the DNA evidence from the collateral murder, without trial counsel's unsupported opening statement, and without the testimony that the blood was not likely deposited on the sock before the murder, the evidence established the following: Hodges's DNA was on both of the socks found on the path taken by the murderer from the victim's home; DNA from the hairs collected at or near the crime scene matched Hodges with a random match probability of slightly over one tenth of one percent; material from the anal swab matched Hodges and excluded 96 percent of the male population; photos that belonged to Hodges and contained his

fingerprints and handwriting were found at the crime scene; a belt and a knife found at the crime scene were identified as similar to a belt and knife owned by Hodges; a jacket found on the path the murderer took away from the crime scene was similar to a jacket that Hodges was seen wearing near the time of the murder; and Hodges confessed that he committed the murder to two witnesses who testified at trial. As a result, Hodges has not demonstrated that any alleged deficiency in these three areas would undermine confidence in the outcome.

## Hurst

During the pendency of Hodges's appeal from the denial of his motion for postconviction relief, the United States Supreme Court issued its decision in Hurst v. Florida, 136 S. Ct. 616, 619 (2016), in which it held that Florida's former capital sentencing scheme violated the Sixth Amendment because it "required the judge to hold a separate hearing and determine whether sufficient aggravating circumstances existed to justify imposing the death penalty" even though "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death." On remand in Hurst v. State (Hurst), 202 So. 3d 40, 57 (Fla. 2016), we held that

> before the trial judge may consider imposing a sentence of death, the
> jury in a capital case must unanimously and expressly find all the
> aggravating factors that were proven beyond a reasonable doubt,
> unanimously find that the aggravating factors are sufficient to impose
> death, unanimously find that the aggravating factors outweigh the

mitigating circumstances, and unanimously recommend a sentence of death.

Hurst v. Florida and Hurst apply retroactively to defendants in Hodges's position who were sentenced under Florida's former, unconstitutional capital sentencing scheme after the United States Supreme Court decided Ring in 2002. Mosley v. State, 41 Fla. L. Weekly S629, S640 (Fla. Dec. 22, 2016).  And in light of the nonunanimous jury recommendation to impose a death sentence, it cannot be said that the failure to require a unanimous verdict here was harmless.  See Franklin v. State, 41 Fla. L. Weekly S573, S575 (Fla. Nov. 23, 2016) ("In light of the non-unanimous jury recommendation to impose a death sentence, we reject the State's contention that any Ring- or Hurst v. Florida-related error is harmless.").  We therefore reverse Hodges's death sentence and remand for a new penalty phase.

## III.  CONCLUSION

For the reasons stated above, we affirm the denial of postconviction relief as to Hodges's conviction but reverse Hodges's death sentence and remand for a new penalty phase.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
CANADY, J., concurs in part and dissents in part with an opinion, in which POLSTON and LAWSON, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

CANADY, J., concurring in part and dissenting in part.

I concur with the decision to affirm the denial of relief regarding Hodges's conviction. But I dissent from the decision to require a new penalty phase. As I have previously explained, Hurst v. Florida, 136 S. Ct. 616 (2016), should not be given retroactive effect. See Mosley v. State, 41 Fla. L. Weekly S629, S641-44 (Fla. Dec. 22, 2016) (Canady, J., concurring in part and dissenting in part).

POLSTON and LAWSON, JJ., concur.

An Appeal from the Circuit Court in and for Escambia County,
      Terry David Terrell, Judge - Case No. 172003CF005683AXXXXX

Robert A. Norgard of Norgard, Norgard, & Chastang, Bartow, Florida,

      for Appellant

Pamela Jo Bondi, Attorney General, and Charmaine M. Millsaps, Assistant Attorney General, Tallahassee, Florida,

      for Appellee